Charles JONES et al., Plaintiffs,

v.

Sol WITTENBERG, etc., et al., Defendants.

No. C70–388.

United States District Court, N. D. Ohio, W. D.

Feb. 17, 1971.

---

8. See Directive of the Court of Appeals, supra pp. 89–90.

94

Advocates for Basic Legal Equality, Inc., Toledo, Ohio, Merritt W. Green, R. Michael Frank, Frank S. Merritt, Gerald B. Lackey, Marshall R. Desmond, Toledo, Ohio, for plaintiffs; Stanley A. Bass, New York City, of counsel.

Francis X. Gorman, Toledo, Ohio, for Charles Jones.

Prosecutor's Office of Lucas County, Ohio, Anthony Pizza and John Hayward, Toledo, Ohio, for defendants County Commissioners, Sheriff and Roberts.

Willard A. Johnson, City Law Dept., Toledo, Ohio, for defendant Wright.

## MEMORANDUM

DON J. YOUNG, District Judge.

This action was commenced by a number of prisoners in the Lucas County Jail, on behalf of themselves individually and as representing a class of persons who either are or may be confined to this facility. The defendants are the three members of the Lucas County Board of County Commissioners, the Lucas County Sheriff, a person designated as keeper of the Lucas County Jail, and the Superintendent of Plumbing and Chief Plumbing Inspector of the City of Toledo, Ohio, the municipal corporation wherein the Lucas County Jail is located.

The complaint alleges that the action is brought under Title 42 U.S.C. § 1983 and Title 28 U.S.C. § 2201, and alleges that this Court has jurisdiction under 28 U.S.C. §§ 1331, 1343(3) and (4), 1361, 2201; Title 42 U.S.C. §§ 1981 and 1983; Rule 46(h) Federal Rules of Criminal Procedure; and the inherent power of the Court to supervise conditions of pre-trial detention.

The complaint seeks both injunctive and declaratory relief.

A motion for a preliminary injunction was filed and an informal hearing was had, at which some minor relief was agreed upon by the parties, and the hearing was continued to a date fixed. At the second hearing, the Court ordered that the matter be heard upon the merits at an early date, the trial to concern itself first with the questions of the Court's jurisdiction and the plaintiffs' rights, with a subsequent hearing on the relief to be granted should the first hearing disclose that the Court had jurisdiction and that the petitioners' rights were being violated.

Thereafter, answers were filed by the various defendants in the form of general denials. A pre-trial conference was held, and on February 10, 1971, the matter came on for a trial which lasted the greater part of two days.

The trial revealed little dispute about the factual basis of the action.

The evidence disclosed that the Lucas County Jail was originally constructed in the last decade of the Nineteenth Century, and is presently about seventy-six years old. It was designed to hold about one hundred fifty prisoners. The prisoners were to be held in two-man cells each six by nine feet in floor area, equipped with two bunks, toilet, and sink with running cold water. The cells are arranged in one large and two small groups on each of three floors of the jail, and were designed with a remote control locking system so that each individual cell could be locked. This locking system has become badly worn, and functions erratically or not at all. Each group of cells opens into an enclosed area, called a bull-pen. The sizes of the bull-pens vary with the number of cells opening into them. Corridors surround the cell-blocks and bull-pens. There is no ventilation or illumination in either the cells or bull-pens. There is some light in the corridors from electric lights and windows, and some air gets into the corridors when the windows are opened or broken. Some of the windows cannot be opened, and broken windows are not repaired promptly, if at all. In each cell-block, one of the original cells has been converted to a rather primitive shower arrangement, but because of the antiquated plumbing, variations in water

pressure make it impossible to control the water temperature in the showers. They sometimes become scalding hot.

Not all of the toilets in the cells work. The soil pipes and waste pipes leak, and the leakage runs upon the floor, which causes problems for those prisoners who, for lack of bunks, are required to sleep on the floor.

Presently the jail holds a population which averages above two hundred prisoners, and has risen at times as high as two hundred seventy-two. About three-quarters of the prisoners are held in pre-trial detention because of their inability to make bond, or because they are held on non-bailable charges. The other prisoners are serving sentences imposed as a result of their convictions for violations of laws, usually misdemeanors.

The prisoners, with the exception of a few trusties, are not furnished with clothing, and there are no facilities for washing their clothing. A few used, and frequently inoperable, washing machines are scattered about the jail, but prisoners have no access to them.

When a prisoner enters the jail he is given a towel, which is replaced by a clean one once a week; a blanket, which may or may not have been washed before it was issued; usually, but not always, a mattress, which often consists of a small piece of foam rubber an inch and a half thick, two feet wide, and from four to six feet long. While bunks have been added so that the cells now hold as many as four bunks, bunks are sometimes placed in the bull-pens, and prisoners frequently sleep on the floor, either in the bull-pens or underneath the bunks in the cells. The prisoners are supposed to be furnished with shaving materials three times a week, but in practice this only happens twice a week, and rarely includes the use of a mirror. The testimony indicated that because of breakage, there were only two mirrors left for the use of the entire population of the jail.

The food for the prisoners is prepared in a kitchen in the basement of the jail. This has recently been improved somewhat by the addition of some donated cooking equipment, but the dishwashing equipment does not meet health standards, as there is no provision for "sanitizing" the dishes after washing and rinsing, which is done by hand. The food storage is not completely adequate or in accordance with health regulations. There is no proper ventilation in the kitchen, and in some of the food handling areas the ceiling is transversed by sewer and water pipes which leak, sweat, or both, onto the floor. The facilities for serving the food are primitive, and result in hot foods cooling and cold foods warming before they are served.

The diet is based on menus which were originally prepared by one of the technical schools in the area, but which are not carefully followed. Because food is not directly purchased by the jail staff, but through the county purchasing department, the planned menus frequently have to be changed because the necessary food supplies were not delivered in time. A study of the meals actually served revealed that they were generally inadequate both in quality and quantity. Certain nutritional elements are seldom provided. On rare occasions, the quantity reaches the minimum level of two thousand calories per day, but it sometimes falls as low as fourteen hundred calories. It never reaches the high edge of average daily requirement for sedentary men, twenty-four hundred calories.

Visitation is very highly limited. Prisoners are permitted visits only on Saturday afternoons from one to four o'clock p. m. Visits by children under eighteen are not permitted. All visits must be conducted by conversing through the heavy screening of the cell-blocks, with both parties standing, usually in groups of as many as three prisoners at a time. There is no semblance of any privacy. Trusties have somewhat greater visiting privileges. The facilities for visitation by attorneys consists of a small cage enclosed by

chain link fence, and located adjacent to the guard's desk, on each floor. No privacy of consultation is possible. There are no telephones, and prisoners are permitted to make calls only at the time they first enter the jail, when they are permitted to call family or counsel. However, if they do not succeed in making contact with anyone at this time, they get no further opportunity.

There are few guards. Supposedly a guard is on duty on each floor twenty-four hours a day. Actually, however, due to absence of members of the guard staff, frequently there will be only one or two guards on duty. There are no means for prisoners to summon a guard, except to make a noise which may or may not be heard. From the guard station it is impossible to see into some of the cell-blocks, and, because of the lack of illumination, difficult to see into the others.

There is no attempt to classify or segregate the prisoners in the jail. Trusties, who are selected from among the sentenced prisoners, have separate quarters. Prisoners charged with murder or manslaughter are generally kept in a single cell-block, and there is one cell-block and some slightly better quarters for the women prisoners. Other than this, persons detained waiting trial and convicts serving sentences, old and young, are mingled indiscriminately.

Health facilities are primitive. A nurse is on duty in the daytime, who supervises the prisoners' medication. There is a jail physician who comes two or three afternoons a week, and is on call at other times, but often cannot be reached. A dentist comes sometimes, but only does extractions. There is no infirmary for prisoners who are ill, and only two small offices or examining rooms, with little or no equipment, for use by nurse, doctor and dentist. If a prisoner is ill enough, he may be removed to one of the local hospitals.

There are no facilities or personnel for social services, exercise, recreation, reading, rehabilitation, or any other human resources to meet human needs.

Discipline is enforced by confinement in one of two cells in the basement of the jail. These cells are of masonry construction, totally unfurnished, without drains or sanitary facilities of any kind. One of them is lighted by a single bare bulb. The other is unlighted. Until the preliminary hearing in this case, it was customary to strip any prisoner who was placed in either of these disciplinary cells, although they are below ground level and unheated. Even women prisoners were sometimes stripped before being placed in one of these cells. Since that time, stripping has been discontinued. On occasions, more than one prioner at a time would be placed in these cells. The high number was sixteen or seventeen men. The length of confinement varies, and the evidence upon it was conflicting. Defendants testified the large group of men was confined less than ten hours. Plaintiffs testified this group was confined there for forty-two hours. The discipline of this confinement is imposed indiscriminately upon convicted prisoners and persons being detained pending trial. It is imposed arbitrarily and without any sort of notice, hearing, or findings, with no right to counsel or assistance in refuting the charges. There was some slight evidence indicating that the decision was supposed to be made after investigation by a different branch of the Sheriff's department, and by a different official than the officer complaining of the offense. It is doubtful at best whether these matters rise to a minimum standard of due process and fair treatment.

The conditions in the Lucas County Jail have been criticized by numerous grand juries, which under Ohio law are required to examine and report on conditions in the jail once during their term. Various civic and professional groups have also criticized the jail from time to time.

The plaintiffs offered expert testimony to show that the Lucas County Jail was outstandingly bad from every standpoint. This expert testimony was not contradicted, and is significant, since lo-

cal jails appear from the literature to be none too good at best. The Lucas County Jail is a local jail at worst.

It should be pointed out that the responsibility for the operation of county jails is badly fragmented by the law of Ohio. The statutes impose certain duties upon the Board of County Commissioners, certain duties on the County Sheriff, and certain duties on the Court of Common Pleas. These statutes have been pretty much disregarded by all of these officials. One of the requirements is for the Court of Common Pleas to make rules for the operation of the jail, which are to be printed and posted in every cell. The defendant Sheriff took office January 6, 1969, and had difficulty locating a copy of these rules. There is no record of any ever having been posted anywhere. Sometime after the commencement of this action, on or about January 29, 1971, the Court of Common Pleas promulgated new rules, which had not, at the time of the hearing, been printed and posted.

On the basis of these facts, it is necessary to examine the legal aspects of the problem. This is not a case of first instance, as other courts have entertained jurisdiction in cases involving conditions of imprisonment and pre-trial detention. See e. g., Palmigiano v. Travisono, 317 F.Supp. 776 (D.R.I. 1970); Sostre v. Rockefeller, 312 F. Supp. 863 (S.D.N.Y.1970); Holt v. Sarver, 309 F.Supp. 362 (E.D.Ark.1970).

 It is well settled that the administration of state detention facilities is a state function. Federal courts have a natural reluctance to interfere with such administration and will intercede only where paramount federal constitutional or statutory rights supervene. Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969); Vida v. Cage, 385 F.2d 408 (6th Cir. 1967); Glenn v. Ciccone, 370 F.2d 361 (8th Cir. 1966). Prisoners do not lose all of their constitutional rights when they enter a penal institution. Rather they retain all of their constitutional rights except for those which must be impinged upon for security or rehabilitative purposes. Washington v. Lee, 263 F.Supp. 327 (M.D.Ala.1966), aff'd per curiam 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968).

 Even if it were a case of first instance, there can be no doubt that what is being done to the plaintiffs is being done by state officers, and under the color of state law. The Court finds that the case comes clearly within the Civil Rights statutes.

 Some of the defendants have urged that this is a proper case in which this Court should apply the doctrine of abstention. Abstention is to be applied "only in narrowly limited 'special circumstances'." Zwickler v. Koota, 389 U.S. 241 at 248, 88 S.Ct. at 395, 19 L. Ed.2d 444 (1967). Cases involving vital issues of civil rights are the least likely candidates for abstention. McNeese v. Board of Education, 373 U.S. 668, 83 S. Ct. 1433, 10 L.Ed.2d 622 (1963); Wright v. McMann, 387 F.2d 519 (2d Cir. 1967). Thus it does not appear that this is a case for abstention. The evidence makes it abundantly clear that with the fragmentation of authority among all three branches of the state government, it would be a tremendous triumph of hope over reality to think that what has been developed in more than a century by conflicting political interests and by public indifference and hostility will be changed by those who are completely embroiled in the resultant mess.

It must also be remembered that those who are seeking relief are also involved with various aspects of the state system. Efforts to combat the evils within the system could have repercussions on the victims of the situation in the form of loss of hoped for advantages, or the imposition of harsher penalties. There can be no doubt of the chilling effect of these probabilities upon the will to seek relief in the very courts which are a part of the problem.

It is apparent also that this action can only be maintained realistically as a class action, the class consisting of those persons who at any given point of time are confined in the Lucas County Jail. The claims of any particular individual could easily become moot at any time, and must become moot within a relative limited period. It is also very difficult to demonstrate that any one individual has suffered a specific wrong which can be righted without regard to the totality of wrongs in the system.

The Court therefore finds that it has jurisdiction to inquire into the problems, that it should not abstain from exercising this jurisdiction, and that this action is properly maintainable by the plaintiffs as representatives of the class of persons confined and to be confined in the Lucas County Jail.

In considering the rights of this class, it must again be pointed out that there are two different categories of persons included within the class. The first, and smaller category, is that of persons who are serving sentences imposed after conviction of criminal offenses. The second, and larger category, is that of persons who are confined pending the trial of criminal charges lodged against them. There is considerable difference between the rights of the two classes.

Considering first those prisoners who are serving sentences, confinement and the loss of most of the privileges of freedom is a proper and constitutional consequence of a conviction for crime. They are entitled to relief in this action only if their treatment contravenes the Eighth Amendment proscription of cruel and unusual punishment, as made applicable to the States by the Fourteenth Amendment.

The official policy of the State of Ohio is that the standards of punishment which prevailed in medieval times are to be followed in dealing with those convicted of crimes. Insofar as possible, they are to be removed to remote places, and confined in harsh and forbidding prisons. In constructing its newest prison facility, the State selected one of its most sparsely populated areas as a site, and a medieval French prison as the basic model for the building.

We may suppose that the constitutional provision against cruel and unusual punishment was directed against such activities. In any event, when the total picture of confinement in the Lucas County Jail is examined, what appears is confinement in cramped and overcrowded quarters, lightless, airless, damp and filthy with leaking water and human wastes, slow starvation, deprivation of most human contacts, except with others in the same sub-human state, no exercise or recreation, little if any medical attention, no attempt at rehabilitation, and for those who in despair or frustration lash out at their surroundings, confinement, stripped of clothing and every last vestige of humanity, in a sort of oubliette.

The constitutional prohibition against cruel and unusual punishment "is not fastened to the obsolete, but may acquire meaning as public opinion becomes enlightened by a humane justice." Weems v. United States, 217 U.S. 349, 378, 30 S. Ct. 544, 553, 54 L.Ed. 793 (1910). If the constitutional provision against cruel and unusual punishment has any meaning, the evidence in this case shows that it has been violated. The cruelty is a refined sort, much more comparable to the Chinese water torture than to such crudities as breaking on the wheel. The evidence also shows that in this case at least, the punishment is unusual. The expert testimony, uncontradicted and not successfully challenged, supplies this evidence. Most jails are bad, but this one is unusually bad. Hence both the necessary elements are present in the case of that category of prisoners who are in the jail to serve their sentences, and they are entitled to relief.

Obviously, if confinement in the Lucas County Jail is a cruel and unusual punishment forbidden to be employed against those who are in jail to be punished, it is hard to think of any

reason why it should be permitted for those who are only in jail awaiting trial, and are, according to our law, presumed to be innocent of any wrongdoing. For centuries, under our law, punishment before conviction has been forbidden. The Constitution does not authorize the treatment of a pre-trial detainee as a convict. Tyler v. Ciccone, 299 F.Supp. 684 (W.D.Mo.1969).

Upon the whole, if the offence be not bailable, or the party cannot find bail, he is to be committed to the county gaol by the *mittimus* of the justice * * *; there to abide till delivered by due course of law. * * * But this imprisonment, as has been said, is only for safe custody, and not for punishment: therefore, in this dubious interval between the commitment and trial, a prisoner ought to be used with the utmost humanity, and neither be loaded with needless fetters, or subjected to other hardships than such as are absolutely requisite for the purpose of confinement only: * * *

4 W. Blackstone, Commentaries 300.

Even in referring to convicted prisoners, the Circuit Court of Appeals for this Circuit has held that:

A prisoner retains all the rights of an ordinary citizen except those expressly, or by necessary implication, taken from him by law.

Coffin v. Reichard, 143 F.2d 443, 445 (1944).

 Obviously, no person may be punished except by due process of law. Here, the evidence shows that at best, those who are in the Lucas County Jail pending trial of charges against them suffer the same treatment as those who are confined there for punishment. Hence, even if that punishment were not cruel and unusual, it would still be proscribed for them, since it is imposed as a matter of form and routine, and without any semblance of due process or fair treatment.

Since, as pointed out by Blackstone and by the decisions of this Circuit, they are not to be subjected to any hardship except those absolutely requisite for the purpose of confinement only, and they retain all the rights of an ordinary citizen except the right to go and come as they please, their confinement as it is handled in the Lucas County Jail denies them the equal protection of the laws.

This Court therefore finds that the class of plaintiffs have shown themselves, by the evidence, to be deprived of their constitutional rights by state officials acting under color of state law, and to be entitled to relief at the hands of the Court.

This opinion will serve as the Court's findings of fact and conclusions of law, and an order will be entered in accordance therewith.

The order will also set this matter for a further pre-trial conference on Monday, February 22nd, at 1:30 o'clock P. M., at which time the matter of further hearing upon the matter of the relief to which the plaintiffs are entitled will be considered, and a date fixed for such hearing.