Clarence Lee DILLARD, on behalf of himself and all others similarly situated, Plaintiffs,

v.

Peter J. PITCHESS et al., Defendants.

Civ. No. CV 73–2947–WPG.

United States District Court,
C. D. California.

Aug. 26, 1975.

Terry Smerling and Anita Susan Brenner, Greater Watts Justice Center, Los Angeles, Cal., for plaintiffs.

John H. Larson, County Counsel, Robert C. Lynch, Asst. Chief Deputy, Frederick R. Bennett, Dennis L. Myers, Deputy County Counsels, Los Angeles, Cal., for defendants.

## MEMORANDUM OF DECISION

WILLIAM P. GRAY, District Judge.

This is a civil rights action in which the plaintiff seeks to challenge, on constitutional grounds, the conditions under which prisoners awaiting trial are housed and maintained in the Los Angeles County Jail facility located on the top floors of the Hall of Justice in the City of Los Angeles (the jail). A declaratory judgment and sweeping injunctive relief are requested. Part of the relief sought will be granted.

### THE PARTIES.

The action was commenced on about December 19, 1973, by the filing of a handwritten complaint in which Clarence Lee Dillard raised several disturbing contentions regarding living conditions at the jail, where he was then a prisoner awaiting trial. Shortly thereafter, Terry Smerling, an attorney affiliated with the Greater Watts Justice Center, filed a comprehensive amended complaint as a class action on behalf of Mr. Dillard and all other unconvicted prisoners at the jail.

The named defendants are the Sheriff of Los Angeles County, his principal as-

sistants, and the members of the County Board of Supervisors.

After appropriate proceedings, the court later designated the plaintiff class to consist of all pre-trial prisoners incarcerated at the jail from December 19, 1973, until May 11, 1974, and appropriate notice was given to the members of the class.

*JURISDICTION.*

▮ This court has jurisdiction with respect to the subject matter of the litigation under 28 U.S.C. §§ 1343(3), 2201, 2202 and 42 U.S.C. § 1983. *Brenneman v. Madigan,* 343 F.Supp. 128 (N.D.Cal. 1972).

.However, the defendants have questioned the jurisdiction of this court to make any adjudication, because of mootness. By the time the trial began, on about June 11, 1974, Mr. Dillard had been convicted of the pending criminal charge and had been transferred to another facility to serve his sentence.[1] The defendants suggest that inasmuch as the principal plaintiff was no longer a prisoner at the jail, he could not be a proper representative of the plaintiff class.

▮ If such a contention were to be considered valid, a constitutional challenge to conditions at a pre-trial detention center, such as the jail, could virtually never be litigated, because the claims of any particular inmate would likely be mooted within a relatively short period of time and before a case could be brought to trial. However, it is well established that the fact that the case has become moot as to the named plaintiff does not bar his litigating the issues on behalf of the other members of the class. *Workman v. Mitchell,* 502 F.2d 1201 (9th Cir. 1974); *Jones v. Wittenberg,* 323 F.Supp. 93 (N.D.Ohio 1971); *see Rivera v. Freeman,* 469 F.2d 1159, 1163 (9th Cir. 1972).

▮ The foregoing does not completely dispose of the contention of mootness. Almost a year has passed since the taking of evidence was completed, and a judgment has not yet been rendered. In the meantime, most, and perhaps all, of the designated members of the class may have had their detention at the jail terminated, for one reason or another. The suggestion is made on behalf of the defendants that these circumstances cast doubt upon the ability of this court to adjudicate the many issues raised on behalf of prisoners at the jail.

In the proceedings that resulted in the designation of the above-described class, it was pointed out by counsel for the defendants that the matter of living conditions of a pre-trial detainee that affect his ability to prepare for and participate in his defense at trial can be raised at such trial. The court was thus mindful of the possibility that an adjudication in this action could have *res judicata* effect with respect to pre-trial prisoners that might be considered to be members of the class. It was largely for this reason that a specific designation of a class was made and notices sent to the members thereof in order that they might "opt out" if so disposed. :

A further reason for designating a class composed of prisoners occupying the jail during a specific period was to provide a means whereby evidence could be limited to a time frame coterminous with the period of incarceration of members of the class. Thus, the defendants became aware that the case that they were obliged to defend would be restricted to conditions and events occurring between December 1973, the commencement of the action, and May 11, 1974, thirty days prior to the scheduled beginning of trial.

For the reasons noted above, the court sought to follow the technical requirements of Rule 23, Federal Rules of Civil

---

[1]. As is noted earlier in this memorandum, and contrary to the situation in *Boyle v. Madigan,* 492 F.2d 1180 (9th Cir. 1974), Mr. Dillard was a pre-trial prisoner at the jail when he filed this action.

Procedure. However, it was apparent to all concerned throughout this litigation that its focus was upon the matter of whether relief should be granted, not just for the benefit of current occupants of the jail, but for the benefit of all future pre-trial prisoners in the custody of the Sheriff of Los Angeles County.

The trial took about fifteen days of court time over a period of more than two months, and each side sought and was granted substantial continuances in the schedule for the filing of extensive post-trial briefs. But the principal delay in announcing a decision has stemmed from the fact that I have found it necessary to read many reported cases, review substantial portions of the record, make personal visits to the jail and the other detention facilities of the county, and do a considerable amount of pondering, in order to reach and articulate a satisfactory resolution of the many complicated issues in this matter. Under such circumstances, I cannot believe that the difficulties inherent in this task must be compounded by the requirement that a complete decision be promulgated according to a time schedule that is dependent upon the turnover of a particular group of pre-trial prisoners at the jail.

*Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) was filed in 1970 as a class action and involved a challenge of the constitutionality of Texas criminal abortion statutes. The plaintiff was pregnant when the action was instituted, but, as the Supreme Court opinion pointed out, the record did not show that she was pregnant at the time of trial or when the trial judge's opinion and judgment were filed. Because of this, and because the 1970 pregnancies of the plaintiff and the members of her class would certainly have been terminated prior to the argument before the Supreme Court in late 1971, the appellant suggested that the entire matter was moot. In responding to such contention, Justice Blackmun, speaking for the Court, referred to the usual rule that in federal cases an actual controversy must exist from the time the action is instituted to the completion of the appellate process. He then pointed out that if such a rule were applied to pregnancy litigation, virtually no such case could be carried to final judgment, including appeal. He then stated: "Our law should not be that rigid. Pregnancy often comes more than once to the same woman, and in the general population, if man is to survive, it will always be with us. Pregnancy provides a classic justification for a conclusion of nonmootness. It truly could be 'capable of repetition, yet evading review.'" 410 U.S. at 125, 93 S.Ct. at 713 (citations omitted). The opinion thereupon held that the termination of the plaintiff's 1970 pregnancy did not render her case moot. It necessarily follows that the case was not made moot by the termination of the pregnancies of all of the other "similarly situated" members of the plaintiff class.

In consideration of mootness, the analogy between pregnancy and pre-trial confinement seems very close. I conclude that, under authority of *Roe v. Wade*, this case has not become moot and that this court retains jurisdiction to render an enforceable decision.

### GENERAL DESCRIPTION OF HALL OF JUSTICE

### COUNTY JAIL AND DETENTION CONDITIONS

The Hall of Justice is a fifteen-story building, square or rectangular in appearance, that was constructed in about 1925 in the civic center of Los Angeles. The lower nine floors then, as now, housed county offices and courts, and the upper floors have always been occupied by the county jail. Originally, this was the only jail facility operated by the county and had a maximum occupancy of about 3,000 prisoners. However, over the years, the expanding jail population has necessitated the construction of additional facilities in other locations,

some of which will be mentioned later in this memorandum.

At the present time, the jail here concerned is used principally for the maximum detention of about 900 pre-trial prisoners and the less restricted accommodation of about 365 "trusties," who perform most of the labor incident to the operation of the institution.

The housing areas for pre-trial prisoners are divided into modules, each of which contains one or more rows of about fifteen cells. The cells along each row open onto a common hall or walkway that is about eight feet wide. Each of the cells is enclosed by a solid wall on three sides and by steel bars and a steel barred and remotely operated door at the end next to the walkway. Each cell is about eight feet by six feet in dimension. A cold water washstand and a toilet are at the end away from the door. An upper and a lower bunk-type bed, made of sheet steel, fold down from one of the walls, taking up about half the floor space of the cell when they are in the down position. The bedding consists of a thin mattress, a washable mattress cover and two blankets. Sheets and pillows are not available. There are no other furnishings in the cell.

The walkway adjoining the cells is barred along the side opposite the cells and at the ends. Access is gained thereto from the outside by means of a steel barred and locked door located at one end.

Corridors not normally available to prisoners separate the modules from the walls and windows that outline the building. The windows, therefore, are at least several yards away from the cells. They are made of relatively small panes of opaque glass, a few of which can be opened for ventilation purposes but are hinged in such manner as to afford minimal outside view to a person standing next to them and none at all from the cells. Except for the relatively small amount of light from the remote windows and the occasional ceiling fixtures along the walkways and corridors, a cell is illuminated only by an unshaded 60-watt incandescent lamp screwed into the single electrical outlet in the ceiling of the cell. The lighting conditions are inadequate for any sustained reading.

The jail is not air conditioned. During the heat of the summer, portable fans are used to try to increase the limited circulation of air afforded by the small windows. Temperature in the modules goes as high as 93° in the heat of the day, and the summer temperature after midnight sometimes stays above 80°. The cold of the winter is offset by hand regulated steam radiators. February temperatures vary from about 62° to 82°, depending largely upon the proximity of a radiator or of a window.

There is no dining hall adequate to accommodate the regular prisoners. The men are fed from mobile steam tables that are pushed inside the walkways adjacent to the cells. A prisoner leaves his cell and takes his place in an informal line approaching the serving cart. His portion of the meal is served onto a stainless steel sectionally divided tray which he then places on a waist-high metal shelf that extends the length of the walkway, and eats while standing in front of it. Alternatively, he may take his tray into his cell and sit on his bunk or on the toilet while he consumes his meal. His sole utensil is a steel spoon, which he keeps in his cell. He also has in his cell a metal cup into which coffee or another beverage is dispensed. The prisoner is responsible for the cleanliness of the spoon and cup, and he normally utilizes the cold water tap in his washstand for such purpose.

There was testimony that buckets of hot water are carried to the modules each morning and distributed on the basis of two or three buckets for fifteen cells. Other than this, only cold water is available for washing and shaving.

The only shower facility available to regular prisoners is on the eleventh floor, and it can accommodate a relatively few bathers at a time. Consequently,

the inmates are allowed showers not more than three times per week; some of them insist that it is about twice. The inmates are escorted in groups from their modules on the tenth, twelfth, thirteenth and fourteenth floors to the showers on the eleventh floor through the use of a stairwell. At the time this case was filed, the practice was to have the men execute this "march" in a naked condition, a process that sometimes took nearly an hour to complete, including time spent on the stairs awaiting access to the showers. Several of the inmates emphasized in their testimony the indignity and the discomfort inherently involved in such a process. It appears that the shower procedure by now has been modified to the extent that prisoners remain clothed while proceeding to the showers.

A substantial portion of the roof of the Hall of Justice is set aside for inmate recreation purposes. This area is generally rectangular in shape, the dimensions being perhaps 100 feet by 40 feet. The walls enclosing the area are more than 12 feet high, the outside view being limited to a portion of the sky.

Twice each month, depending upon the weather, the inmates occupying a particular module are taken to the roof for somewhat less than an hour. About two basketball backboards and nets are available to those that want to try a few shots, although the uneven surface of the floor and the prohibition against contact sports preclude the playing of a regular game. Single wall handball is also available. Because of the limited facilities in relation to the number of men seeking to use them, or because of their own preferences, most of the men spend their time on the roof standing around or sitting on the blankets that they bring with them from their beds.

A branch of the Los Angeles County Public Library is located within the jail, which contains a limited selection of books on a rotating basis. Books from the library are loaded onto a cart that is pushed into the various modules of the jail and is made accessible to a particular prisoner once every two weeks. He may select a book from the cart and keep it until the next visit. If he wants a book that is not on the cart but happens to be available in the branch library, it is likely to be provided for him at the next visit of the cart, two weeks hence. If it is not on hand at the branch library, the procuring of it takes much longer if it is accomplished at all. Prisoners are not allowed to receive books brought by visitors, and they may retain no more than six paperbacks in their cells.

A prisoner is out of his module only during the infrequent trips to the roof, the brief and occasional shower periods, a visit from a family member or an attorney, response to sick call or receipt of medical attention, or an appearance in court. The remainder of the time is spent either in his cell, in the adjoining walkway, or in the cell of another prisoner in the same cell block. There is no television, no radio, no entertainment other than what he and those who share his cell block can create, such as playing cards or dominoes on the concrete floor. Unless he has a penchant for writing, and except to the extent that his inclination and the strength of his eyes will permit him to read, most of the time there is little for him to do but sit or lie on his bed.

The average stay of a prisoner at the jail is between thirty and sixty days; somewhat fewer than three percent are there longer than six months.

*OTHER DETENTION FACILITIES.*

The principal reason for assigning a pre-trial prisoner to the Hall of Justice jail is the fact that his case is scheduled for trial in the Criminal Courts Building directly across the street, thus removing the otherwise substantial problem of bus transportation to and from court. The Sheriff operates several other establishments for the detention of prisoners, both unsentenced and sentenced. Some of the issues here to be decided require

that consideration be given to a description of some of these facilities and the conditions under which their prisoners are maintained. Nothing herein is intended in any way to constitute a judicial evaluation of the appropriateness of any of these facilities as places of detention; they are discussed here only to show wherein they compare favorably with the Hall of Justice jail.

*The Central Jail* is located approximately one mile from the Los Angeles civic center and houses about 2,700 unsentenced prisoners and about 400 trusties. The cell arrangement for pre-trial prisoners is much like that of the Hall of Justice jail, except that the cells have upper and lower bunks for six men rather than two. However, inmates at the Central Jail have several advantages not available to Hall of Justice prisoners, the most important of which are that they take their meals in a dining room and have daily use of shower rooms located at the ends of the cell modules. Also, one of several day rooms is frequently available to Central Jail prisoners, where they may sit at tables and play games or write or talk.[2] A chapel that will accommodate several hundred inmates is used for the presentation of occasional shows or musical entertainment, as well as regular church services.

*Biscailuz Center* is approximately three miles from the civic center of Los Angeles. It houses about 250 unsentenced prisoners and about 280 sentenced prisoners. The men sleep in two-story wooden frame buildings that are much like the familiar army barracks that sprang up throughout the country during World War II. On each floor there are 64 cots, 32 on each side of the room, with a 5-foot partition serving as a center divider. The side walls are lined with large glass windows that afford a view of a flower garden or other landscaping on one side, and a remote (and therefore reasonably pleasant) panorama of East Los Angeles from the other. The general atmosphere may fairly be described as light and airy. At the end of each dormitory is a bathroom containing an adequate number of toilets, washstands and showers, which the men may use at any time. Each barracks has a day room that contains a large color television set. The several barracks buildings are in a single enclosed area, and the men may go in and out of their own dormitories, as well as the adjacent dormitories, or may go outdoors and walk about the enclosure or play cards or other games on a picnic-type table.

Meals are served to all inmates in a centrally located dining hall that can accommodate at least 300 people at one time. The service is cafeteria style and the utensils are steel knives, forks and spoons.

When the weather is good, the pre-trial prisoners are taken to an outdoor recreational yard or athletic field. It is not very large, but there is a full-size basketball court bordered by four other basketball backboards and nets. On the occasion of my visit, about 100 inmates were in the area. Some were playing half-court basketball; some were competing in horseshoes; some were demonstrating or developing their prowess with weight lifting equipment or on the horizontal bar; and others were visiting in small groups or just sitting on the grass.

In the evening, movies are shown in the mess hall and are generally accessible to the inmates.

A person confined at Biscailuz Center is out of doors much of the time, and, in his movements from one place to another or while in his dormitory, he can have within his sight trees and shrubs and hills and the far horizon, in enviable contrast to the confines of the Hall of Justice jail.

2. Television sets were originally provided, but the speed with which they were broken or smashed by some of the inmates has discouraged the authorities from replacing them.

*Wayside Honor Rancho (Maximum Dentention)* is about one hour's drive from downtown Los Angeles and is located in an agricultural setting amid trees and rolling hills. The approximately 840 prisoners (600 sentenced and 240 unsentenced) are housed in a single large maximum security building. In each of the dormitory-type rooms, beds for about 60 inmates are arranged in four rows. The large fluorescent overhead lights give ample illumination for reading, and the large windows on one side help keep the area reasonably bright. At one end of each dormitory are tables for games or writing and an elevated color television. A bathroom containing toilets, washstands and showers is immediately adjacent to each dormitory and is available as the inmate desires. Meals are served cafeteria style in a dining hall that seats about 200 people.

The unsentenced prisoners are allowed to go to the exercise area each morning and each afternoon if they so desire. It contains three full-size basketball courts and facilities for handball, weight lifting, and ping pong. There is also a makeshift running track around the perimeter.

In the building is a branch of the Los Angeles County Library to which an inmate may obtain permission to visit and make his selection of books if the library is not otherwise crowded. He may take the books to his own bunk and keep them for two weeks. If he desires books that are not presently available, the librarian will undertake to obtain them for him.

*Wayside Honor Rancho (Minimum Security)* is immediately adjacent to, but completely separate from, the maximum security facility that has just been described. It accommodates only sentenced prisoners, the current occupancy being about 900. The men live in single-story bungalow-type dormitories that are located on either side of a grass-covered and tree-lined rectangular park. Behind each dormitory is a constantly accessible building containing showers, toilets and washstands. The dormitories and the park are enclosed by a high fence and by gates that are kept locked at night, but the dormitories are not locked. Meals are served in a mess hall that is similar to those earlier described in this memorandum. The utensils are steel forks and spoons.

The facility contains a large recreation hall where regular movies and occasional live entertainment are presented. Elsewhere within the compound a large grass-covered area is set aside for athletics and recreation, a softball diamond and backstop being prominent.

## THE MERITS OF THE ACTION.

■ 1. *Due Process Of Law.* The plaintiff charges that the detention of unconvicted prisoners in the Hall of Justice jail under the conditions hereinabove described constitutes summary punishment without due process of law in violation of 42 U.S.C. § 1983 and the Fifth and Fourteenth Amendments to the United States Constitution. This court agrees and so holds.

■ It must be remembered that the prisoners concerned in this action are held prior to trial and thus have not been convicted of anything. They are still entitled to the presumption of innocence, and their detention cannot be for purposes of punishment, deterrence or retribution. *Anderson v. Nosser*, 438 F.2d 183 (5th Cir. 1971). Such prisoners are in custody only because they cannot make the bail that is deemed necessary to insure their presence at trial. Although the public interest has been held to justify the detention of an accused for such purpose, it has been well established since the days of Blackstone that he must otherwise be treated with all of the consideration that the need for confinement will allow.

"Upon the whole, if the offense be not bailable, or the party cannot find bail, he is to be committed to the county gaol by the *mittimus* of the

justice . . .; there to abide till delivered by due course of law . . . . But this imprisonment, as has been said, is only for safe custody, and not for punishment: therefore, in this dubious interval between the commitment and trial, a prisoner ought to be used with the utmost humanity, and neither be loaded with needless fetters, or subjected to other hardships than such as are absolutely requisite for the purpose of confinement only: . . . ."
4 W. Blackstone, Commentaries 300.

This valid principle has been given current expression by Judge Zirpoli in *Brenneman v. Madigan*, 343 F.Supp. 128, 138 (N.D.Cal.1972), as follows:

"To paraphrase *Covington v. Harris*, 136 U.S.App.D.C. 35, 419 F.2d 617, 623 (1969), the principle of the least restrictive alternative consistent with the purposes of a commitment inheres in the very nature of pre-trial confinement which entails an extraordinary deprivation of liberty justifiable only when the detainee is unable to make bail. To be sure, the State's interest in insuring the presentment of an accused for trial is weighty, but 'even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of legislative abridgement must be viewed in the light of less drastic means for achieving the same basic purpose.' *Shelton v. Tucker*, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960)." *See also, Jones v. Wittenberg*, 323 F.Supp. 93, 100 (N.D. Ohio 1971); *Hamilton v. Love*, 328 F.Supp. 1182, 1191–92 (E.D.Ark.1971).

Any deprivation of liberty is, of course, very substantial punishment. But the punishment imposed upon a man by confining him in the Hall of Justice jail in order to insure his presence at trial is far more onerous than the legitimate purpose of such confinement can justify. Nothing in such purpose re-

quires or justifies that a man be forced to spend substantially all of his time in one of the drab and dismal cells described earlier in this memorandum, virtually without recreation, diversion or entertainment; where the depressing monotony is not broken by a change of setting even at meal time; and where he sleeps and eats in immediate proximity to the toilet, necessarily in the hope that his cellmate's digestive system will remain reasonably regular and subdued.

From the testimony at the trial, it is evident that the punishment imposed upon the pre-trial inmates confined in the jail is not due to the vindictiveness of those in charge of their custody, but stems instead from the antiquated nature of the facility itself. The Sheriff's principal assistants responsible for the operation of the jail are Chief Knox and Captain Carpenter. They and their staff of deputies appear to the court to be enlightened and dedicated detention officers. They are aware of the inadequacies of the jail's physical facilities, and they are simply trying to do the best that they can with whatever is available to them. Indications are that they keep the jail as clean and scrubbed and painted as the place will tolerate, and that they show reasonable consideration for the sensibilities of the inmates within their charge.

However, it is equally evident that reasonable dining facilities, outdoor exercise and other recreation, regular access to showers and hot water, major restructuring of the antiquated two-man cell system, and the overcoming of the dismal atmosphere of the entire facility, cannot be accomplished at the present jail without substantial expenditure of money, if at all.

The problem now arises as to the proper function of a federal court when confronted with a constitutional challenge of the nature here presented. The defendants quite naturally urge the doctrine of abstention, and many considerations come to mind that impel careful evaluation of the applicability of this

principle. Such considerations have been well stated by Justice Powell in the opinion of the Court in *Procunier v. Martinez*, 416 U.S. 396, 404–05, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974):

"Traditionally, federal courts have adopted a broad hands-off attitude toward problems of prison administration. In part this policy is the product of various limitations on the scope of federal review of conditions in state penal institutions. More fundamentally, this attitude springs from complementary perceptions about the nature of the problems and the efficacy of judicial intervention. Prison administrators are responsible for maintaining internal order and discipline, for securing their institutions against unauthorized access or escape, and for rehabilitating, to the extent that human nature and inadequate resources allow, the inmates placed in their custody. The Herculean obstacles to effective discharge of these duties are too apparent to warrant explication. Suffice it to say that the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. For all of those reasons, courts are ill-equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism. Moreover, where state penal institutions are involved, federal courts have a further reason for deference to the appropriate prison authorities."

The above-quoted comments are extremely pertinent to the present case. However, they do not relieve the court from further responsibility in the matter, for the very next portion of Justice Powell's opinion states the following:

"But a policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims whether arising in a federal or state institution. When a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights." 416 U.S. at 405–06, 94 S.Ct. at 1807.

■■■ *Procunier v. Martinez* ruled specifically that a United States District Court should adjudicate a constitutional challenge directed against prison regulations concerning mail censorship and limitations upon legal assistance to inmates. However, as has been noted hereinabove, the imposition upon pretrial detainees of living conditions more onerous than necessary to insure their presence at trial does constitute very substantial punishment. Such punishment is without due process of law and thus is a violation of the constitutional rights of inmates. As the opinion in *Procunier v. Martinez* states, federal courts have an obligation to protect these constitutional rights.

Having reached such conclusion, this court takes considerable comfort in the awareness that a growing number of federal judges, when similarly confronted, have assumed the constitutional obligation of taking appropriate steps to require major changes in the housing and treatment of state prisoners awaiting trial. *See, e.g., Rhem v. Malcolm*, 371 F.Supp. 594 (S.D.N.Y.1974); *Inmates of Suffolk County Jail v. Eisenstadt*, 360 F.Supp. 676 (D.Mass.1973); *Collins v. Schoonfield*, 344 F.Supp. 257 (D.Md. 1972); *Brenneman v. Madigan*, 343 F. Supp. 128 (N.D.Cal.1972); *Jones v. Wittenberg*, 323 F.Supp. 93 (N.D.Ohio 1971).

This court is fully mindful that the correction of the deficiencies in the facilities for the handling of pre-trial prisoners that will be required as a result of this litigation will be very expensive to a county that, like virtually all other governmental bodies, already is con-

fronted with monumental fiscal problems. This is necessarily a matter of considerable concern. However, if public safety and the effective enforcement of the criminal laws are deemed to require the pre-trial incarceration of selected defendants, the public must be prepared to pay the cost of keeping them under the reasonably humane conditions that their constitutional rights demand. As Justice (then Judge) Blackmun said in rendering the opinion of the Court in *Jackson v. Bishop*, 404 F.2d 571, 580 (8th Cir. 1968), "Humane considerations and constitutional requirements are not, in this day, to be measured or limited by dollar considerations . . . ." *See also, Holt v. Sarver*, 309 F.Supp. 362, 385 (E.D.Ark. 1970); *Brenneman v. Madigan*, 343 F. Supp. 128, 139 (N.D.Cal.1972); *Inmates of Suffolk County Jail v. Eisenstadt*, 360 F.Supp. 676, 687 (D.Mass. 1973).

In light of all of the foregoing, it is concluded and will be adjudged that the keeping by the defendants of unconvicted prisoners in the Hall of Justice jail, under the conditions hereinabove described, constitutes the imposition of summary punishment without due process of law, in contravention of the Fourteenth Amendment of the United States Constitution and in violation of 42 U.S. C. § 1983.

■■■ 2. *Equal Protection Of The Laws.* The plaintiff charges that pre-trial prisoners at the jail are denied equal protection of the laws in contrast to defendants in criminal cases that remain at liberty pending trial because they can afford to post bail. As has been noted above, individuals that are the subjects of pending criminal prosecutions may constitutionally be detained if necessary to insure their presence at trial. However, ". . . they are not to be subjected to any hardship except those absolutely requisite for the purpose of confinement only, and they re-

tain all the rights of an ordinary citizen except the right to go and come as they please . . . ." *Jones v. Wittenberg*, 323 F.Supp. 93, 100 (N.D.Ohio 1971). The hardships imposed upon the pre-trial prisoners here concerned are far greater than necessary for purposes of confinement. The inevitability of this conclusion is underlined by the fact that the dismal conditions at the jail are significantly inferior to those existing in the other places of detention operated by Los Angeles County, as has been discussed in this memorandum, and are also far inferior to those of the California State penal institutions[3] and the federal prisons located in California.[4] The plaintiff's claim that detention of pretrial prisoners at the jail denies them equal protection of the laws must be sustained.

■■■ 3. *Cruel And Unusual Punishment.* The plaintiff also claims that imprisonment in the jail under the conditions there existing constitutes cruel and unusual punishment. In seeking to evaluate this claim, it must be acknowledged at the outset that the jail has been holding human beings in detention ever since it was established in 1925 and has been doing so in the precise manner for which it was designed. However, treatment of detainees that might have been acceptable fifty years ago ". . . may, with the passage of time, cease to meet the community's standards of humane treatment, particularly as people learn more about the goals and problems of penology." *Inmates of Suffolk County Jail v. Eisenstadt*, 360 F.Supp. 676, 688 (D.Mass.1973).

As has been noted above, detainees at the jail are kept, for weeks or months at a time, in poorly ventilated and dimly lit cells, without any view of the out of doors; without adequate facilities for personal hygiene; being obliged, in effect, to take all of their meals in the "bathroom"; and without any opportunity for recreation or regular physical

---

3 & 4. These are matters as to which the court takes judicial notice.

exercise worthy of the name. At the trial, uncontradicted expert testimony was expressed that such conditions are physically and psychologically unhealthy. I believe that this is so beyond dispute and that, under any responsible modern day evaluation, to keep *any* person for long periods of time in such manner constitutes cruel and unusual punishment. However, it is not necessary to go that far in order to sustain the plaintiff's contention here, for the law is clear that to inflict such conditions upon a person awaiting trial is to violate the Eighth Amendment prohibition against cruel and unusual punishment. *Rhem v. Malcolm*, 371 F.Supp. 594 (S.D.N.Y.1974); *Inmates of Suffolk County Jail v. Eisenstadt*, 360 F.Supp. 676 (D.Mass.1973); *Collins v. Schoonfield*, 344 F.Supp. 257 (D.Md.1972); *Brenneman v. Madigan*, 343 F.Supp. 128 (N.D.Cal.1972); *Jones v. Wittenberg*, 323 F.Supp. 93 (N.D. Ohio 1971). "For centuries, under our law, punishment before conviction has been forbidden. The Constitution does not authorize the treatment of a pretrial detainee as a convict." *Jones v. Wittenberg, supra* at 100. In Los Angeles County, pre-trial detainees housed in the Hall of Justice jail are treated far worse than are convicts, as the hereinabove discussed comparison with other detention facilities of the county clearly demonstrates. This is constitutionally intolerable.

4. *Prejudice To A Fair Trial (Lack Of Sleep On Court Days).* Criminal calendars are regularly conducted in thirty-three state court facilities, located throughout Los Angeles County, as well as at the Criminal Courts Building in the Los Angeles civic center. On each court day, about 600 to 800 pre-trial detainees are scheduled for appearance at these courts, and they are transported by the Sheriff in buses. Included among the men so transported to courthouses away from the civic center

are a substantial number (often 40 or more) who are housed in the Hall of Justice jail.[5] The driving time to these outlying courts ranges from a few minutes to almost an hour; the presence of some of the detainees is required by 8:15 a. m., and some must remain until early evening. The obligation to collect so many prisoners from several places of detention and transport them to so many courts for such extended periods of time imposes a formidable logistics problem upon the Sheriff. The accomplishment of this task has resulted in the development of a processing schedule that makes a long and arduous court day for a detainee at the jail.

On days that such a detainee is scheduled for a court appearance, he is awakened at about 3:30 a. m. After he dresses and has a quick breakfast, he is taken to a "holding tank" where he waits until all of the court-bound prisoners are assembled. Small groups of the men are chained together and escorted to a bus, which usually leaves at about 5:00 a. m. and goes to the Central Jail. There, the men are unchained and placed in holding tanks according to their respective court destinations. Somewhat later, they are rechained and are placed in buses at about 7:00 a. m. The buses then move to a nearby parking area where they wait for "stragglers" to be placed aboard. At about 7:30 a. m. they begin their respective journeys to the courthouses.

Upon arrival at the courthouses, the men usually are taken to detention cells to await contact by their attorneys or for their cases to be called. After their court appearances are over, they go back to the detention cells. The return bus trip to the Central Jail does not begin until all of the prisoners are no longer needed at the courthouse. Thus, the time of departure varies from about 5:00 p. m. to about 6:30 p. m.[6] As the

---

5. Pre-trial prisoners in the Hall of Justice jail having appearances in the Criminal Courts Building across the street regularly walk.

6. Sometimes men whose court appearances are over by noon are returned to the Central Jail on an earlier bus that leaves about 2:00 p. m. However, such returnees have a

buses from the various courthouses arrive at the Central Jail, passengers that are prisoners to be taken on to the Hall of Justice jail are reassembled in a holding tank. They wait there until transported to the Hall of Justice jail where they are processed in, showered, fed and ultimately returned to their cells. The above described day normally ends by about 9:00 p. m., but it appears that in many instances it is after 11:00 p. m. before the last court-goer is bedded down. And then, if his trial occupies successive days, he is up again at 3:30 a. m. and the whole process is repeated.

For a man to be subjected to such a procedure for just one day, while he is undergoing the emotional strain inherent in attending his own trial or other court proceeding, would likely bring him to a condition approaching physical and nervous exhaustion by early afternoon. To require it of him on successive days is intolerable, for his ability to be of assistance to his attorney or otherwise conduct himself to his best advantage must necessarily be affected. Certainly, due process of law requires that a defendant not be denied the opportunity for a reasonable night's sleep before each day of his trial.

Earlier in this memorandum this court expressed an awareness that the obligation to transport so many prisoners to so many far-flung courthouses places some very great logistical problems upon the Sheriff, and the court believes that he and his associates have been trying their best to solve such problems. However, if the County of Los Angeles cannot accord a full night's sleep to prisoners that it elects to try in its outlying courthouses, it simply will have to house such prisoners in facilities more proximate to the courthouses or try them in courthouses more proximate to its jails.

5. *Medical Diagnosis And Treatment.* Counsel for the plaintiff charged, and sought to prove at the trial, that the facilities for medical diagnosis, treatment and care at the jail are grossly inadequate and thus in violation of the constitutional rights of the inmates. The attitude with which this court approaches this issue is well expressed in *Fitzke v. Shappell,* 468 F.2d 1072, 1076 (6th Cir. 1972):

"... fundamental fairness and our most basic conception of due process mandate that medical care be provided to one who is incarcerated and may be suffering from serious illness or injury. This is not to say that every request for medical attention must be heeded nor that courts are to engage in a process of second-guessing in every case the adequacy of medical care that the state provides. But where the circumstances are clearly sufficient to indicate the need of medical attention for injury or illness, the denial of such aid constitutes the deprivation of constitutional due process."

*See also, Tolbert v. Eyman,* 434 F.2d 625, 626 (9th Cir. 1970). It is equally true that constitutional rights are violated if prison officials fail to provide medical care to inmates that is reasonably designed to meet their routine and emergency health care needs. *See, Campbell v. Beto,* 460 F.2d 765, 768 (5th Cir. 1972); *Battle v. Anderson,* 376 F. Supp. 402, 424 (E.D.Okla.1974); *Collins v. Schoonfield,* 344 F.Supp. 257, 277–78 (D.Md.1972).

Inmates at the jail who suffer substantial physical injury or who develop illnesses that are recognized as obviously serious or contagious are taken to the larger and better equipped infirmary at the Central Jail or to the jail ward of the County Hospital. With this qualification, medical services at the jail are the direct responsibility of Patrick J. Lavelle, a duly licensed M.D.,[7] whose assignment is reported to be on a full-time

---

longer wait in the Central Jail until the later arrivals catch up with them.

7. This was the situation as of the time of trial. I am not sure whether or not there has been a later change in personnel.

basis. He regularly arrives at the jail on Monday, Tuesday, Thursday and Friday at about 8:30 a. m. Prior to that time, the daily "sick call" line, usually consisting of about 200 inmates, has formed. Pursuant to the doctor's standing instructions, the nurses screen from the line the fifteen or twenty inmates that, in their judgment, constitute the most serious cases and refer them to the doctor. When the doctor arrives, he sees, examines, and treats or prescribes for the men so referred; he then leaves the jail and hurries to a well-known private clinic in Los Angeles where he is a full-time member of the medical staff. Dr. Lavelle testified that his above-described duties at the jail regularly keep him there until 10:30 or 11:00 a. m. However, he admitted that appointments are regularly made for him at the clinic beginning at 10:00 a. m. and that his constant awareness that his clinic patients are waiting causes him to hurry in his work at the jail.

Dr. Lavelle was somewhat ambiguous in his testimony as to the flexibility of his instructions to the nurses concerning the limits on the numbers of men that he would see from the sick call. At one point, he said that if on a given day there were more than twenty people that the nurses felt should see a doctor, he would ask them to pick out the twenty most serious cases and defer the rest until the next day. This would be true whether the complaint involved nervous tension or chest pains, or apparently anything else. Inasmuch as Dr. Lavelle normally does not come to the jail on Wednesday or Saturday or Sunday, a deferral to the "next day" might sometimes be more protracted.

The doctor did state that on any day's visit he would see all patients whose problems were emergent, no matter how many. However, it was quite clear from the testimony that the nurses have the major responsibility of determining which of the prospective patients merit the doctor's attention and that they are obliged to be extremely selective in this determination because of the limitations of time.

All sick call applicants that are not selected to see the doctor are diagnosed and treated by the nurses. For example, the nurses give tranquilizers to those that they determine to be suffering from nervous tension, or anxiety, or narcotic or alcoholic withdrawal, and they select among Thorazine, Librium or Valium as the most appropriate drugs and administer them accordingly. They diagnose epilepsy, place the patient in the infirmary and begin injections or oral dosages of Dilantin and Phenobarbital. If the patient is manic, they place him in three or four point restraint.

Dr. Lavelle does not have staff meetings with his nurses, and he has not given them formal or written instructions. However, he expressed the conviction that they are well able to make the above-described medical decisions, because each is an experienced registered nurse and because, through their daily observation of the manner in which he treats the patients that he sees, they learn, as he put it, on a "monkey see, monkey do" basis. Dr. Lavelle stated that his general directions to the nurses are, first, that he would be less critical of them for doing something than for neglecting to do something that should have been accomplished. The second rule is that they should "know what they don't know, that is, to be aware of their limitations."

The chief physician for the Sheriff's Department has caused to be compiled a Medical Manual for the guidance of all members of the medical staff of the Department. It contains, among many other things, Hospital Order #50, which prescribes in considerable detail the treatment, including drugs, that may be administered by the nurses ". . . until such time as these patients can be evaluated by a Jail Physician." The order covers a substantial list of diseases and ailments that may be so treated, including, for example, acute post-alcoholic syndrome, cardiac condi-

tion, acute asthma, and diabetics. The chief physician testified that the Manual as a whole is reviewed for modification once a year or every two years, and that the above-described Hospital Order #50 is reviewed more frequently and in specific respects has been amended by memorandum or by oral instruction. Dr. Lavelle is aware of the Manual; he "imagines" that there are a couple of copies in the jail infirmary; he has never read the Manual in full; he does not know the extent to which his nurses have copies; and he is not aware of any amendments thereto, in writing or otherwise.

Dr. Lavelle testified that he does not make daily rounds within the infirmary.[8] He sees each infirmary bed patient only once, such encounter being either on the occasion that he orders a patient placed in the infirmary or at the time of his first visit after the patient has been placed in the infirmary by a nurse.

Counsel for the plaintiff presented medical experts who condemned virtually every aspect of the medical facilities and procedures and techniques at the jail as "medieval," completely inappropriate, or at least falling below accepted medical practice. They challenged the professional competency of a registered nurse to diagnose the various ailments hereinabove discussed and to exercise discretion as to drug administration or other treatment. They expressed the view that the doctor's practices and procedures in handling inmate patients fall below acceptable medical practice, apart from his undue reliance upon and inadequate supervision of the nurses. They asserted the Medical Manual to be obsolete and in many respects simply wrong in its instructions for the handling of specific diseases. They also expressed

the conviction that the physical facilities and the medical equipment for the examination and treatment of prisoner patients are inadequate, even though Dr. Lavelle could think of nothing that he would want to change.

On the other hand, the defendants presented expert testimony to the effect that, although there are some aspects in which correction is indicated, the medical facilities program and supervision at the jail are basically satisfactory and in reasonable compliance with standards published by the American Correctional Association.

This court is impressed with the likelihood that some, and perhaps most, of the criticisms asserted by the plaintiff's experts may be well founded. In any event, the evidence showed clearly that the health care program at the jail does not have the affirmative, undiverted and devoted on the spot leadership that is so essential to the adequate operation of any institution of this nature. However, this court lacks the expertise to undertake to evaluate issues such as the adequacy of the Medical Manual, the appropriateness of the extent to which the nurses are practicing medicine, and the sufficiency of the personal performance and supervision exercised by the doctor in charge. The extent to which the plaintiff's contentions are correct will govern whether or not there are constitutional violations warranting action by this court as part of its federal jurisdiction. Thorough and detailed observation and guidance by unbiased and highly competent medical experts is believed to be needed in order to accomplish any satisfactory resolution of these issues. This court also feels the need for expert medical guidance as to whether or not the evidence shows a violation of California statutory law (Penal Code § 4023)[9] which provides that "Whenever

---

8. This appears evident, for the doctor expressed the belief that the infirmary contains two wards, when in fact it appears that there are three.

9. This issue is believed to be proper for consideration as a matter of pendent jurisdiction, which the plaintiff has sought to invoke. "The state and federal claims must

the daily average of more than 100 persons are confined in any county or city jail there shall be available at all times a duly licensed and practicing physician for the care and treatment of all persons confined therein."

It is my informal understanding that the Los Angeles County Medical Association, if properly requested, would be willing to designate a team of qualified doctors who would make a survey as to the sufficiency of the medical facilities and procedures at the jail and report its findings to the court. It is my intention to make such a request and upon receipt of the resulting report to give counsel appropriate opportunity to consider and respond to it. I would thereby expect to gain substantial enlightenment in undertaking to evaluate and decide the various medical issues raised in this case.

6. *Miscellaneous Complaints Meriting Relief.* Except as otherwise noted, no orders will be made at present with respect to matters commented on in the following subparagraphs. Instead, the defendants are directed to include in the report that will be required later in this memorandum a statement concerning the steps that shall have been taken in conformity with such comments, or they shall show cause therein why such action should not be required.

(a) *Visits by relatives.* Visiting hours for regular prisoners are only from 10:00 a. m. to 2:30 p. m. People seeking to visit trusties may also come between 6:00 p. m. and 8:00 p. m. Evening hours of visitation should also be available to families of regular prisoners, in order to facilitate visits by those who are in school or who must work during the day.

A prisoner is separated from his visiting wife or child by a glass partition, and they must use a "telephone"

for voice communication. By contrast, sentenced prisoners at Biscailuz Center and at the two Wayside Honor Rancho Institutions are allowed contact visits. Appropriate consideration must be given to the greater problems of institutional security at the County Jail, on the one hand, and, on the other hand, to the importance of contact visits to the morale of an inmate and to the constitutional right of a pre-trial prisoner not to suffer any more privation than the need for his detention necessarily requires. It seems to me that, under all of the circumstances, the latter factors weigh heavier in the balance and that prompt steps should be taken to permit reasonably controlled contact visits to pre-trial prisoners in the Hall of Justice jail.

(b) *Accessibility of telephone.* Under present regulations, prisoners may make outgoing telephone calls only pursuant to court order and in emergency situations as authorized by the watch commander. Nothing in the need to detain a prisoner pending trial requires that he be substantially restricted in his ability to be in telephone communication with the outside world. Pay telephones should be installed in such numbers and at such locations that all prisoners can have reasonable access to them at all reasonable times.

(c) *Availability of books, newspapers and magazines.* Rather than have to wait for the bi-weekly visit of the book cart, with its meager selection, prisoners should be entitled to make occasional visits to the jail library and check out one or more books from the shelves or request that particular volumes not then available be placed on order. The procedure here suggested appears to work well at Biscailuz Center and at both Wayside Honor Rancho Institutions.

---

derive from a common nucleus of operative fact. But if, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is *power* in federal courts to hear the whole." *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S. Ct. 1130, 1138, 16 L.Ed.2d 218 (1966).

■ Contrary to present regulations, prisoners should be entitled to receive, from visitors or through the mail, any newspapers, books or magazines that may lawfully be delivered by the postal service. The obvious burden of inspection for contraband that would result is believed to be overweighed by the First Amendment rights of pre-trial prisoners.

(d) *Posting of rules.* The Sheriff necessarily has developed a list of rules of conduct that prisoners are obliged to obey. These rules should be posted in a more legible and widespread manner, and amendments thereto should be promptly and more thoroughly publicized, in order to insure that the inmates understand clearly what is expected of them.

7. *Miscellaneous Complaints Not Meriting Relief.* Although there may have been occasional instances in which conditions or official conduct were such as to justify complaint, I find that the policies and practices in the following areas are generally satisfactory and that judicial intervention is not presently warranted:

(a) The periodic shakedown inspections in the cells.

(b) The matter of food nutrition and preparation.

(c) The handling of mail to and from attorneys and others.

(d) Disciplinary procedures.

(e) Facilities for attorney-prisoner interviews.

(f) The procedure at Central Jail for the medical screening of arriving prisoners.

## CONCLUSION AND ORDER

This memorandum shall constitute findings of fact and conclusions of law, in accordance with Rule 52(a) of the Federal Rules of Civil Procedure. The court is aware that, even with the full cooperation anticipated from the defend-ants, many of the things that must be done in order to implement these findings and conclusions will take a considerable amount of time. Some cannot be accomplished fully until the Hall of Justice jail is supplanted as a place of detention for pre-trial prisoners; others can be accomplished, at least in part, much sooner. The manner of how and according to what schedule the necessary changes can reasonably be made should be given first consideration by the defendants.

Accordingly, the defendants are directed to submit, by October 31, 1975, a memorandum which shall describe the steps that already shall have been taken in harmony with this memorandum and shall propose, in as much detail as possible, a plan and schedule for the overcoming of the remaining constitutional deficiencies herein discussed. The plaintiff may submit written comments upon the defendants' memorandum by November 10, 1975, and this matter will be calendared for further proceedings on November 17, 1975, at 2:00 p. m. At such hearing the terms of an interim decree as required by this opinion will be considered. The court will retain jurisdiction over this matter until all indicated corrective action shall have been taken.

Counsel for plaintiff are entitled to reasonable attorneys' fees, as requested. They are invited to file an appropriate motion for such fees which shall document the basis for the amount to be claimed. The defendants will presumably elect to respond according to the usual motion procedure.

This court would be willing, at the request of either party, to certify this interlocutory decision for appeal. It is my opinion that, within the meaning of 28 U.S.C. § 1292(b), the conclusions upon which the order herein rendered are based involve at least one ". . . controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially

advance the ultimate termination of the litigation." However, this court will not grant a stay of any of the correction activities herein required or to be required pending such appeal.