George **HAMILTON** et al., Plaintiffs,

v.

Monroe **LOVE**, Sheriff of Pulaski County, et al., Defendants.

No. LR-70-C-201.

United States District Court, E. D. Arkansas, W. D.

April 25, 1973.

Philip E. Kaplan, Walker, Kaplan & Mays, Linda Scholle, Legal Aid Bureau of Pulaski County, Little Rock, Ark., for plaintiffs.

Lee Munson, Pros. Atty., Jimmy Patton, Deputy Pros. Atty., Little Rock, Ark., for defendants.

EISELE, District Judge.

The complaint in this action was filed on September 30, 1970, and the Court has maintained jurisdiction over the matter from that date forward. Plaintiffs sought a declaratory judgment and preliminary and permanent relief on the grounds that the conditions of their incarceration in the Pulaski County Jail constituted violations of their rights to equal protection of the law, procedural and substantive due process and amounted to cruel and unusual punishment. The specific allegations were numerous and have been a source of concern during the entire pendency of this suit.

At a February 24, 1971 hearing the parties submitted a stipulation to the Court wherein defendants admitted that the general conditions existent at the jail did not meet minimum federal constitutional requirements. The stipulation went further in detailing actions to be taken by defendants to bring the physical facility and its operation up to minimum constitutional standards. At that time it was contemplated that a new jail facility, which was then in the initial planning stage, would be complet-

ed by December of 1973. Plans have gone forward but there have been delays. It now appears that occupancy of that facility will, at the earliest, take place in July of 1974.

The Court entered an "interim order" on February 24, 1971, directing defendants to implement the agreement evidenced by the stipulation of the same date. Following "status reports" from both parties, two additional hearings and an on-site inspection, the Court filed a comprehensive memorandum opinion on June 2, 1971.[1] An Interim Decree directing specific action by defendants followed. the opinion on June 22, 1971. The last two paragraphs of that decree read:

"Defendants will advise the Court, on or before July 30, 1971, of the progress they have made in implementing the Stipulation, heretofore filed in this action by said defendants, especially noting the progress made in those areas covered by said Stipulation but not specifically referred to in this decree.

"All issues in this proceeding not disposed of by this interim decree are reserved. The Court will retain jurisdiction until the operation of the Pulaski County Jail meets the requirements of the Constitution of the United States. The Court expects and assumes that the operation of this facility will be in full compliance on or before September 1, 1971."

On February 14, 1972, plaintiffs filed a "Motion for Show Cause Order" asking the Court to order defendants to show cause why they should not be held in contempt for having "flagrantly defied the orders of this court . . . [in continuing] . . . to operate the Pulaski County Jail in an unconstitutional manner." A civil contempt hearing was held on August 31, 1972; the Court's Memorandum and Order followed on October 3, 1972. The text of

that Memorandum and Order is quoted in full below:

"On February 14, 1972, plaintiffs filed a motion 'to show cause why (defendants) should not be held in contempt' for failure to comply with the orders of this Court. Informal conferences were held July 26, 1972, and September 13, 1972, and a formal hearing on the motion was held August 31, 1972.

"Although various violations of the Court's prior orders were proved by plaintiffs, the Court, not without serious misgivings, will not at this time adjudge any of defendants to be in contempt. The Court set out in its June 2, 1971 Memorandum Opinion the minimum constitutional standards under which the Pulaski County Jail could continue to detain persons accused, but not convicted, of crimes. Although the defendants could not be ordered to maintain such standards, the Court did determine that, if the facility is to be operated at all for such purposes, it must meet those minimum standards.

"To remind defendants of the gravity of the issues the Court refers them to its June 2, 1971 opinion:

'With only insignificant exceptions, the Pulaski County jail is an institution used for the purpose of detaining persons who are awaiting trial. The inmates are either being detained because they cannot afford the fee for the bail bond set for them—the usual case—or because they have been accused of a capital or "non-bondable" offense. In all cases, such detainees are presumed innocent, in the eyes of the law, of the crime which they have been charged. Their actual guilt or innocence remains for future determination . . . . .

'. . . It is clear that the conditions for pre-trial detention must not only be equal to, but superior to, those permitted for prisoners

---

1. Hamilton v. Love, 328 F.Supp. 1182 (E.D.Ark.1971).

serving sentences for the crimes they have committed against society.

'The only legitimate state purpose served by holding in jail those who are unable to make bond is to make certain that those detained are present when their cases are finally called for trial.'

"At the informal conference held on September 13, 1972, counsel for the defendants, John Forster, indicated that certain actions would be taken immediately by defendants to bring the facility into compliance in those areas where problems still exist. The Court's decision not to hold defendants in contempt is primarily a result of those representations, which the Court takes to have been made in good faith. Mr. Forster is directed to report within two months on the progress made in those areas discussed at that conference.

"Attorneys for plaintiffs have, since the first hearings in this lengthy proceeding, earnestly requested that the Court make an award of a reasonable attorney's fee in favor of plaintiffs and the class they represent. No action upon that request was taken because of what the Court viewed as an extremely affirmative good faith attitude on the part of defendants during the initial phases of the case. Since that time, however, it appears that defendants have become lax in the discharge of their duty to operate the county jail in accordance with minimum constitutional requirements, and, indeed, possibly indifferent to the manifold serious problems at hand. As a result, the attorneys for plaintiffs have been subjected to a barrage of complaints emanating from the jail and have spent much additional time investigating such matters and presenting them to this Court. The Court is therefore now awarding the sum of $1,000.00 as a partial attorney's fee for plaintiffs. This is far below what could fairly be called a 'reasonable fee' for the services ren-

dered. The Court is reserving its decision on an award of a more realistic fee pending future developments.

"The Court wishes to make it clear that it will be less hesitant in the future to adjudge defendants to be in contempt, particularly where the individual responsibility of a designated defendant is made apparent from the evidence. The role of each of the defendants has been more clearly defined as a result of the recent meetings and hearing. The Court will require strict compliance with existing and future orders.

"It is ordered that attorney for the defendants report to this Court on or before December 4, 1972, on the status of defendants' acts of compliance with the Court's orders and their independent good faith efforts to bring the operation of the jail up to minimum constitutional standards. It is further ordered that defendants pay to the attorneys for plaintiffs the sum of $1,000.00 as a partial attorney's fee for services rendered.

"The applications of both plaintiffs and defendants for modifications of the Court's prior orders will remain under submission until the Court receives and reviews the report of defendants' attorney referred to above. In the interim the Court will expect the defendants to comply with existing orders."

On August 8, 1972, plaintiffs filed a motion for amplification of, and defendants filed a motion for modification of, the Court's June 22, 1971 interim decree. Plaintiffs requested that the Court order defendants to provide detainees with shaving cream, razors and other necessary toilet articles, that no censorship of mail be permitted and that visiting hours be maximized. Defendants, on the other hand, requested that 18, instead of 20, staff persons be approved by the Court, that defendants be allowed to inspect outgoing mail of high risk detainees, that persons in cells 3, 4, 8 and 9 be excluded from the recreation

program unless the population of their cell exceeds 75 per cent of its designated capacity and that confinement of juvenile detainees with adults be allowed under certain circumstances. Plaintiffs filed, on November 15, 1972, a motion to tax the costs of Service of Garnishment in connection with collecting the $1,000.00 award of a partial attorney's fee and of acquiring a copy of the contempt hearing transcript. These three motions are presently pending, but will be disposed of in the Order entered pursuant to findings of fact and conclusions of law as set out herein.

Throughout the course of this litigation, the Court believed the February 24, 1971 stipulation would provide a basis for compromise and accommodation, giving optimum discretion to defendants over the ways and means of improving the jail facility while preserving the integrity of constitutional principals. Defendants have failed, however, to adhere to the letter and the spirit of *their* commitments and to the orders of this Court. On January 24, 1973 the Court received defendants' last report on conditions at the county jail, and defendants now take the position that the Court's existing orders have been complied with and that the facility and its present operation meet minimum federal constitutional standards.

Some progress has been made at the existing facility during the last three years. Use of the isolation cell or "the hole" was discontinued early in the suit. A major concern of the Court was the prevention of assaults and homosexual attacks by detainees on other detainees during extended periods of unobserved and unsupervised detention. With additional personnel defendants have been able to reduce significantly, if indeed not to eliminate altogether, those most serious problems. Telephone calls are no longer monitored. Previous court orders concerning mail inspection and censorship have been substantially complied with. Defendants have recently instituted an adequate medical examination and medical care program. The Court is convinced that defendants have made good faith efforts to rid the jail of rats, roaches and poisonous insects. The meals served detainees are adequate and have been since the commencement of this suit. Plaintiffs have not referred to fire fighting equipment since early in the suit, and it is the Court's impression that the defendants have acquired such equipment. Although the Court believes that present visitation policies probably do not violate minimum constitutional requirements, it nevertheless notes that present visitation privileges are minimal and could, by proper utilization of staff, be increased considerably. Visitation privileges are very important to most detainees. The reasonable extension of those privileges would, like the recreational program referred to below, improve morale, and give further recognition to the necessity of approaching as nearly as possible the goal of detention-without-punishment, dealing, as we are, with persons awaiting trial and presumptively innocent of crimes. After numerous evidentiary hearings the Court has concluded that the use of brutality in dealing with detainees is not a policy of the defendants or of the jail personnel. Indeed it is contrary to defendants' policy. Force has been used on occasions, but the Court finds that such force was used only in cases of necessity and as a last resort and, when used, within legal limits. This does not mean that the defendants may relax their vigil in this regard. It is their continuing duty to carefully advise and instruct all jail personnel on conditions in which force may be used and the manner of its use where legally justified. After almost three years, however, grave problems remain.

*Exercise and Recreation Program*

In a status report submitted April 7, 1971, defendants stated the following:

"Laborious moving operations have been in process on the fourth floor of the jail which, as of April 8, 1971, will be completely cleared. This constitutes a substantial beginning toward implementing exercise and recreation-

al facilities for the inmates. It is also a tangible indication of defendants' good faith efforts to comply with the stipulation."

 Judge Mackey testified in a January 16, 1973 hearing that although recreation equipment [2] for use on the fourth floor had been requisitioned by the Sheriff's office, he had not ordered the items because the security risk was too great. He also testified that the county lacked the funds to purchase such equipment, but later receded from this position. The Court has previously stated that inadequate resources can never be an adequate justification for the state's depriving any person of his constitutional rights.[3] Moreover, the Court is convinced that the county has, or can readily obtain, the necessary resources not only to implement a reasonable recreational program but also to bring even this obsolete facility up to minimum constitutional standards and to comply with all previous orders of this Court. Given an adequate staff, which the Court has required in previous orders, defendants have no justifiable basis for denying detainees the benefits of a reasonable exercise and recreational program. This Court stated in its memorandum opinion of June 2, 1971, at 1192–1193 that:

". . . the overly strict and unreasonable controls on the physical movement of detainees and lack of the necessary space for exercise and other normal physical activities might render detention under such circumstances constitutionally inadequate.

"Here the defendants have cleared out the open areas on the fourth floor of the jail which, the Court finds, could be readily adapted for exercise and recreational programs. The defendants, however, have indicated that, with inadequate staff, they are concerned with the security problems incident to the movement of the prisoners, in small groups or otherwise, from the cells to the fourth floor recreation area and the return of such prisoners from the fourth floor to their cells. In view of the testimony of Mr. Wingfield of the Bureau of Prisons with respect to staff requirements and the decision of the Court, set forth below, on the personnel needed to meet constitutional requirements, the Court assumes that the defendants, upon compliance, will have the necessary personnel to move into an exercise and recreational program utilizing the open spaces on either the fourth or the third floor of the jail. It therefore further assumes that any unreasonable restrictions upon the physical movement and physical activity of the inmates will be removed as soon as the necessary trained personnel are on hand."

In that opinion the Court also described the conditions which made recreation programs so important:

"The average inmate spends most of his time sitting or lying upon his bunk. Indeed, inactivity, in miserable surroundings, was the principal feature of the detainees' existence as the situation existed when this proceeding was initiated."

*Id.*, at 1189.

Not until the January 16, 1973 hearing was the Court informed that defendants believed the fourth floor area could not be used for exercise or recreation.

---

2. The Court has never ordered defendants to purchase any specific recreational equipment. The Court's concern is that defendants initiate some kind of exercise and recreational program. The details of such a program have been left to the discretion of defendants in the hope that they would initiate a *reasonable* program. All detainees need not be given recreational opportunities at the same time. Defendants may wish to proceed with small groups. Although a previous order of this Court may have implied that each detainee should be given this opportunity every day, the Court does not require this. The goal is a reasonable program, conceived and implemented in good faith.

3. 328 F.Supp., at 1194.

Defendants assert in their January 24, 1973 status report that:

> ". . . no physical rehabilitation will be undertaken with reference to the fourth floor of the Pulaski County Jail. It is estimated that the replacement of the windows would cost in excess of $10,000. The defendants direct the Court's attention to the fact that the windows as installed are encased in metal frames and that the hinges and locks on same have rusted and that most are broken. Thus, the frames would have to be removed and new ones replaced. It is further pointed out to the Court that a special type of reinforced shatterproof glass is required in the confinement facility and the cost of frames and glass to rehabilitate the fourth floor would be prohibitively expensive considering the fact that the projected completion date of the new confinement facility is December, 1973."

So, as of the date of this opinion there is still no recreation and exercise program for those detainees who might like to avail themselves of such a program. Since the implementation of such a program has always been tied to personnel and staffing factors by the defendants, it is important to deal further with those factors here.

Defendants have increased their paid jail staff from 14 to 18 members but have requested modification of the Court's previous decree. The Court's June 22, 1971 Interim Decree provided that:

> ". . . The defendants shall, on or before September 1, 1971, provide enough paid 'free-world' personnel to enable them to assign at least one such staff member to each 'cell' floor to continually patrol in the immediate area of each and every person detained in any of the cells in the Pulaski County Jail on a 24-hour-a-day basis. . . . Unless defendants can satisfy the Court, after application and hearing, that fewer paid personnel are needed to accomplish this objective the following will be required:

> "A. Where prison population is above 75, assuming an approximate ratio of 65 male prisoners to 10 female prisoners, defendants will, not later than September 1, 1971, have a paid staff consisting of not less than 20 personnel, of which four shall be female matrons. By way of interim progress toward the satisfaction of this requirement, the Court requires an addition to the present staff of at least two paid personnel, of which at least one will be a female matron, on or before June 30, 1971; an addition of at least three paid personnel between June 30 and July 30, 1971, of which at least two will be female matrons; with full compliance by September 1, 1971.

> "B. If the prison population is reduced to 75 or fewer detainees, assuming an approximate ratio of 65 males to 10 females, and if said population is maintained at or below this level, defendants will be required to have a total of 16 paid 'free-world' personnel, of which four will be female matrons. Under this population condition, defendants, by way of interim progress, must hire at least two additional paid personnel by June 30, 1971, of which at least one will be a matron, and defendants will be in complete compliance not later than July 30, 1971."

The above decree was formulated to make it possible to have one paid "free-world" staff member on each "cell" floor at all times and to assure that defendants removed the overly strict and unreasonable controls on the physical movement of detainees.

Implicit in Judge Mackey's and Captain Allen's concern about "security problems" created by any exercise and

recreation program is an apparent belief that the Pulaski County Jail staff is still inadequate to support such a program. It therefore follows that a modification of the Court's previous staff requirement decree is not in order.[4] Indeed, in view of the defendants' latest testimony it is not clear that they would agree that the minimums of 20 and 16, depending upon population, would be adequate for such purposes. Defendants have not made a sufficient showing of any substantial security problem inherent in the use of an exercise and recreation program; nor have they made a good faith effort to even experiment with such programs.[5] The defendants are not in compliance with the Interim Decree and the Court is not inclined to modify it in the light of the circumstances.

*Racial Segregation and Population Classification*

The Court ordered defendants, on June 22, 1971, to:

". . . submit a plan for the racial integration of the Pulaski County Jail facilities not later than July 30, 1971, which plan shall set forth a schedule for the implementation thereof . . .".

and to:

". . . submit to the Court a plan for the classification of detainees, according to criteria which they deem appropriate, which will permit the appropriate segregation and handling of detainees and which may take into consideration such criteria as prior record, prior disciplinary problems, age, and the like."

█ Defendants reported to the Court on August 10, 1971, that the jail had been integrated and that defendants were attempting to group detainees "as nearly as possible as to age, crime com-mitted, prior record and potential for violence." It developed subsequently, however, that the cells were again segregated and all attempts to devise a classification system were abandoned. Captain Allen testified in the January 16, 1973 hearing that the cells were segregated at the request of black prisoners. Defendants' January 24, 1973 report indicates that the cells are now integrated and that detainees are classified according to the offense charged.[6] While the Court recognizes that a rational classification system at the county jail would not serve as useful a purpose as a system devised for a larger facility having a variety of treatment, educational and rehabilitation programs and used to house persons convicted of crime, defendants nevertheless must make a reasonable effort to classify detainees along lines previously indicated by the Court. The present system allows the consideration of only one factor: the offense charged (of which, of course, the detainee is presumed innocent). The Court notes that Mr. Dwayne Basinger of the Federal Bureau of Prisons has been available to defendants for consultation and has offered to aid defendants in the development of a classification system. Clearly a more rational and useful classification program can be devised. And, clearly also, the system presently used is constitutionally suspect.

*Rules and Regulations*

█ In the February 24, 1971 stipulation defendants agreed to provide each incoming detainee with a printed copy of all rules and regulations regarding prisoner conduct and privileges. The Court additionally ordered defendants to read such rules and regulations to incoming detainees who could not read and to keep a copy of same posted in each cell at all times. The Court finds that

---

4. On August 8, 1972 defendants moved for modification of the Court's June 22, 1971 interim decree to decrease the number of "free-world" staff members required by the Court.

5. Captain Allen testified that detainees were taken to the fourth floor for exercise for a few days but that this was abandoned because of the detainees' lack of interest.

6. One exception: federal prisoners are simply housed separately, as one group, regardless of the charges against them.

defendants have substantially complied with the posting requirement but that, contrary to the Court's orders, they have not consistently provided each incoming detainee with a copy of the rules and regulations. Nor have they consistently read and explained such rules where required. There is no justification for noncompliance. The defendants have referred to a "litter" problem, but the Court has made it clear that defendants' employees can take up the copies of such rules after they have served their purpose. Prior notice of jail rules is indispensable to a subsequent due process enforcement· of those rules by the imposition of sanctions or even denial of privileges.

*Mail*

■ Mail was also a topic of plaintiffs' motion for modification of the Court's interim order. Plaintiffs requested that the Court forbid all censorship of outgoing mail. The Court has previously enunciated the standards and procedures to be used by defendants in the inspection of mail. No mail may be censored. No outgoing mail may be inspected unless: permission is granted by the sender; the sender has a prior record of escape; or the jail authorities have knowledge, or a reasonable basis to believe, that an escape is planned. Defendants may also apply to the appropriate court for wider permission to inspect outgoing mail under compelling circumstances not presently foreseen.

■ At the most recent evidentiary hearing, plaintiffs produced testimony that postage stamps were generally unavailable to detainees. Defendants could provide postage stamps and other material at actual cost with little inconvenience to the staff. Detention in the facility should not unreasonably impair plaintiffs' rights to communicate with the outside world. Limitations on access to the postal system, when coupled with severe limits on visitation and severe limits on telephone communication, does unreasonably impair plaintiffs' rights to communicate with the outside world.

*Personal Hygiene*

■ Defendants reported on August 10, 1971 that detainees ". . . are provided with laundry facilities for their present clothing as often as required. In this regard, arrangements have been made with the Arkansas Department of Corrections to purchase three uniforms for each detainee at the rate of $2.00 apiece, and this will be implemented as soon as funds are approved." It now appears that detainees are able to periodically send out clothing to be laundered, but those without a change of clothing must continue to launder their one set in wash-sinks in the cells. No uniforms have been purchased. It is obvious that improvements in this area must be made.

Also relevant to the personal hygiene of the detainees is plaintiffs' request that the Court modify its interim decree to order defendants to provide inmates with shaving cream, razors and other necessary toilet articles. Testimony at the hearings has indicated also that the supply of soap at the institution is inadequate. The Court will not prescribe specific implements and amounts to be made available to detainees, but the Court will require defendants to provide sufficient toilet articles to allow detainees. to maintain a reasonable state of personal cleanliness. Within this duty is the requirement that defendants evolve some method by which detainees can periodically shave.

*Ventilation and Cooling*

Early in this litigation defendants purchased and initiated the use of five window fans in an attempt to remedy the very serious cooling, heating, and ventilation problems at the facility. The large sheets of plate metal bolted over some window bars remain, however, and the Court is not convinced that the present ventilation system is adequate for the extreme summer conditions.

*General Condition of Facilities*

■ The Court found, at the inception of this litigation, that the cell areas of the jail were ". . . dark, dirty,

very unsanitary . . . smelly and, overall, unhealthy and depressing places." Defendants, during the very early phase of this proceeding, did institute a general cleaning and painting program which substantially improved the condition of the jail facility. Defendants, however, have allowed the jail to again deteriorate greatly during the pendency of this suit and the Court finds that, on the evidence submitted during the last hearings, the cell areas of the jail are once again dark, dirty and unsanitary and, overall, unhealthy and depressing places. The plumbing is completely inadequate. Moreover, defendants have not maintained and repaired even this inadequate system to its maximum potential. The results are obvious from an examination of the photographs received in evidence at a recent hearing. Although detainees may not be forced to work, they should be given the opportunity and equipment to sweep and clean their cells more than once a day. The services of those prisoners actually convicted of crime and serving sentences as "trustees" may certainly be utilized in the effort to keep the facility in a sanitary condition.

The Court has not and could not set forth specific constitutional standards applicable to all jail-type detention facilities. We are not here dealing with absolutes. The existing jail facility must be judged in light of its present programs and its own peculiarities.[7]

■ On the basis of the above findings of fact the Court must conclude that the defendants have failed to comply with a substantial number of the Court's previous orders and as a result the Pulaski County Jail and its operation still do not meet minimum federal constitutional standards. The three defendants, although in different areas and in varying degrees, are responsible for the present physical condition and the present operational policies existent at the Pulaski County Jail. All three defendants must therefore be adjudged to be in contempt of this Court's prior orders.

The Court will therefore impose token fines of $250.00 on Judge B. Frank Mackey; $250.00 on Sheriff Monroe Love; and $50.00 on Captain O. A. Allen. The Court will suspend execution of these fines pending complete compliance by the defendants with the Court's prior orders and the order to be entered by this Court, pursuant to this opinion. Such compliance should be completed within 60 days of the filing of this memorandum. If defendants have not so complied with all orders of this Court within said 60 days, but nevertheless continue to operate the jail for the detention of persons charged with, but not convicted of, crimes, the Court will impose additional, realistic fines on the responsible defendant, or defendants, for each day of noncompliance beyond that date. Nothing herein shall be construed as ordering or requiring defendants to continue the operation of the Pulaski County Jail. If, however, they choose to continue said operation, it must be brought fully to compliance as indicated.

The Court will award the sum of $1,500.00 as a further partial attorney's fee for plaintiffs. The Court will also award plaintiffs their costs.

All previous findings of fact and conclusions of law not varied or superseded hereby, or by previous orders, are hereby adopted and ratified.

### FINAL DECREE

In conformity with the Court's findings of fact and conclusions of law set forth and referred to in its Memorandum Opinion filed this day, it is hereby ordered, adjudged, and decreed that the Pulaski County Jail facility and its operation must meet the following requirements and standards by June 25, 1973,

---

7. For example, it is necessary that defendants develop a recreation and exercise program at the present facility in order for it to meet minimum constitutional standards. Such a program might not be necessary in other facilities with different physical plants and different programs.

or defendants shall cease and terminate the operation of said facility.

1. Defendants shall not censor any mail sent or received by detainees. No outgoing mail shall be inspected unless permission is granted by the sender; the sender has a prior record of escape; or the jail authorities have knowledge, or a reasonable basis to believe, that an escape is being planned. Defendants shall provide detainees with postage stamps, envelopes, and paper at actual cost.

2. Defendants shall develop and implement a reasonable exercise and recreation program. Although the Court is not directing defendants to rehabilitate any specific area of the jail for this purpose, defendants must do whatever is necessary to make some area adequate for the purpose decreed.

3. The Court ratifies and adopts item 9 of its Interim Decree of June 22, 1971, except that June 25, 1973 is substituted for July 30, 1971.

4. Defendants shall inform each incoming detainee of all rules and regulations regarding prisoner conduct and privileges. A copy of said rules shall also remain posted in, or within reading distance of, each cell at all times.

5. Defendants shall provide detainees with necessary shaving and toilet articles.

6. Defendants shall provide each detainee not having a change of clothing with at least one uniform or other change of clothing and shall launder detainee's clothing or jail garb at least once a week.

7. Defendants shall make any improvements necessary to provide and utilize an adequate, healthy cooling and ventilation system for the Pulaski County Jail. If it is necessary to remove the steel plates from cell windows to reach the ordered result, this must be done.

8. Defendants shall repair and keep in operable and sanitary condition necessary plumbing fixtures and bathing and toilet facilities. Defendants shall paint, clean and keep the holding areas of the Pulaski County Jail in a condition that meets normal, non-penal, institutional hygienic standards. Defendants should consult with the Pulaski County health authorities for assistance and advice in meeting their obligations under this and other sections of this order relating directly or indirectly to health problems.

All motions for modification or amplification, unless referred to herein, are denied.

All previous orders of this Court not varied or superseded hereby are adopted and ratified.

It is further ordered that a fine of $250.00 be imposed upon Judge B. Frank Mackey; that a fine of $250.00 be imposed upon Sheriff Monroe Love; and that a fine of $50.00 be imposed upon Captain O. A. Allen. All fines are suspended on the condition that defendants are either in compliance with all of the Court's orders by June 25, 1973, or cease and terminate the operation of the Pulaski County Jail for the detention of persons awaiting trial by that date.

Defendants shall pay to attorneys for plaintiffs the sum of $1,500.00 as an additional partial attorney's fee for services rendered. Plaintiffs' November 15, 1972 "Motion to Tax Costs" in the amount of $30.04 is granted. Plaintiffs' attorneys shall file with the Court an affidavit itemizing court costs incurred during the pendency of this litigation. Such other costs as the Court finds reasonable will be assessed against defendants.