Jethro **MOORE** et al., Plaintiffs,

v.

Theodore J. **JANING,** etc., et al., Defendants.

Civ. No. 72–0–223.

United States District Court, D. Nebraska.

Dec. 29, 1976.

---

18. Section 660 is also discussed in *Wilhelm* at 164. Both section 660 and section 652(a)(8) are referred to in *Golightly* at 863.

Terrence J. Ferguson, Vard R. Johnson, Robert V. Broom, Legal Aid Society of Omaha-Council Bluffs, Omaha, Neb.; Robert S. Catz, Washington, D.C., for plaintiffs.

Henry L. Wendt, Deputy County Atty., Douglas County, Omaha, Neb., for defendants.

DENNEY, District Judge.

This class action, which was filed on April 12, 1972, arises under the provisions of 42 U.S.C. § 1983 and the United States Constitution. Jurisdiction is conferred by 28 U.S.C. § 1343(3) which grants jurisdiction without regard to the amount in controversy in cases seeking redress for infringement of civil rights, and by 28 U.S.C. §§ 2201 and 2202, providing for declaratory and injunctive relief. The Court also has pendent jurisdiction to hear integrally related claims arising under the laws of the State of Nebraska.

The plaintiff class includes those persons, male and female, who are or will be incarcerated at the Douglas County Jail, Douglas County Courthouse, Omaha, Nebraska [Courthouse jail] and the Interim Jail Facility, 11th and Dodge Streets, Omaha, Nebraska [Interim jail], pending trial. The class is limited to pretrial detainees and does not include persons who have been convicted of criminal charges and who are confined in the above institutions pending or serving sentences. The defendants are the Sheriff and the Commissioners of Douglas County, Nebraska, sued in their official capacities.

By this lawsuit, the plaintiffs seek to improve the conditions of their confinement at the Courthouse and Interim jails. Since the commencement of this suit, the Courthouse jail has undergone substantial remodeling, resulting in improved conditions at the facility in many respects. In addition, other claims presented in the complaint [Filing # 1], amended complaint [Filing # 19] and second amended complaint [Filing # 35] are now moot or are unsupported

by any evidence in the record.[1] These factors and the commendable cooperation by the parties' counsel with each other and with the Court have substantially narrowed the issues to be determined. The issues remaining for resolution concern the living conditions of the facility in which female detainees are housed at the Interim jail, the availability of recreation and exercise for detainees in both jails, the restrictions on detainees' visiting privileges and telephone usage at both jails, the limited access by detainees to legal books and materials, and the dissemination of the jail rules to detainees, so that they may be aware of their rights and obligations.

The plaintiffs' motion for a preliminary injunction [Filing # 53] has been consolidated with the resolution of this case on its merits. The plaintiffs' motion for summary judgment [Filing # 77] is hereby denied, and this memorandum shall constitute the Court's findings of fact and conclusions of law on the merits of this controversy. The findings of fact herein are based on the parties' stipulations, the affidavits, depositions, answers to interrogatories, and documents produced through discovery, the photographs and other exhibits which have been submitted to the Court [Filing # 87] and the Court's personal observations during an inspection of the women's detention facility at the Interim jail on November 22, 1976.

In *Bell v. Wolff,* CV. 72–L–227 (D.Neb. 1973), Chief Judge Warren Urbom of this Court set forth the standards against which the plaintiffs' challenges to the conditions of their confinement are to be tested.

[I]t must be stressed that the determinative principle against which all treatment of a pretrial detainee is to be assessed is that he is not to be subjected to any hardship, except those necessary to ensure his secure confinement and, hence, his appearance at trial. Considerations of necessary security aside, pretrial detainees have all the rights of ordinary citizens because, not having been adjudged guilty of anything, they are ordinary citizens. *Anderson v. Nosser,* 438 F.2d 183 (C.A. 5th Cir. 1971); *Brenneman v. Madigan,* 343 F.Supp. 128 (U.S.D.C. N.D.Calif.1972); *Jones v. Wittenberg,* 323 F.Supp. 93 (U.S.D.C. N.D.Ohio 1971). *See Stack v. Boyle,* 342 U.S. 1 [72 S.Ct. 1, 96 L.Ed. 3] (1951). *Id.* at 2–3.

*See also Rhem v. Malcolm,* 371 F.Supp. 594, 622–23 (S.D.N.Y.1974), *aff'd,* 507 F.2d 333 (2nd Cir. 1974), in which the court noted the growing recognition of prisoners' rights and the increasing intervention by the federal courts to protect those rights.

[In] recent years, the assertion of constitutional rights by prisoners has been litigated largely in the federal courts. In earlier times the federal courts withheld action or acted with great caution in such cases, observing the principle of comity and recognizing that the administration of prisons requires an expertise to which courts do not pretend. However, the reluctance to assert authority has rapidly eroded in recent years as one federal court after another has concluded that conditions in America's prisons and jails have sunk below federal constitutionally acceptable levels. As the United States Supreme Court has put it, "Federal courts sit not to supervise prisons but to enforce the constitutional rights of all 'persons,' including prisoners."

The plaintiff class is composed of persons who are not at liberty only because they cannot afford bail or because they have been charged with nonbailable offenses. They have not been convicted of any crime, and they are presumed to be innocent of the charges against them. The state may detain a person for trial, but any additional punishment must be justified by a valid interest of the state. *Cudnik v. Kreiger,* 392 F.Supp. 305, 311–12 (N.D.Ohio 1974). The state has legitimate interests in assuring a detainee's appearance at trial and in maintaining the security and inter-

---

1. For example, the questions of medical care, hiring practices, food preparation and mail censorship are no longer at issue in this case.

nal order of its jails. Any prison condition, policy or practice which is punitive in effect must bear a relationship to and must further these legitimate interests of the state. "Considerations of rehabilitation, deterrence or punishment are not material." *Seale v. Manson,* 326 F.Supp. 1375, 1379 (D.Conn.1971).

▉ A detainee may not be confined in conditions which are harsher in fact than convicted prisoners experience. In fact, there is a general consensus that conditions for pretrial detention must be superior to those provided for inmates who have been convicted and are serving sentences. Moreover, the imposition of punishment without conviction deprives an accused of due process.

▉ Thus, the state is required to use "the least restrictive alternatives" to achieve its interests and may not deprive a detainee of his liberty to an extent greater than necessary. "[A]ny deprivation of or restriction of the detainee's rights beyond those which are necessary for confinement alone must be justified by a compelling necessity." *Detainees of Brooklyn House of Detention for Men v. Malcolm,* 520 F.2d 392, 397 (2nd Cir. 1975), *cited in Martinez Rodriguez v. Jimenez,* 409 F.Supp. 582, 593 (D.P.R.1976). The state may not "justify the denial of other unrelated rights for budgetary reasons." *Rhem v. Malcolm,* 520 F.2d 1041, 1044 (2nd Cir. 1975). "Lack of adequate economic resources does not excuse, nor does it lessen, the obligation of states and local governments to provide jail facilities which are constitutionally adequate." *Alberti v. Sheriff of Harris County, Texas,* 406 F.Supp. 649, 669 (S.D.Tex. 1975), *citing Finney v. Ark. Board of Corrections,* 505 F.2d 194 (8th Cir. 1974). "If the state cannot obtain the resources to detain persons awaiting trial in accordance with minimum constitutional standards, then the state simply will not be permitted to detain such persons." *Hamilton v. Love,* 328 F.Supp. 1182, 1194 (E.D.Ark.1971);

*Brenneman v. Madigan,* 343 F.Supp. 128, 139 (N.D.Cal.1972).

Other cases in accord with the above views include *United States ex rel. Tyrrell v. Speaker,* 535 F.2d 823 (3rd Cir. 1976); *United States ex rel. Wolfish v. Levi,* 406 F.Supp. 1243 (S.D.N.Y.1976); *Miller v. Carson,* 401 F.Supp. 835 (M.D.Fla.1975); *Dillard v. Pitchess,* 399 F.Supp. 1225 (C.D.Cal. 1975); *Wilson v. Beame,* 380 F.Supp. 1232 (E.D.N.Y.1974); *Inmates of Suffolk County Jail v. Eisenstadt,* 360 F.Supp. 676 (D.Mass. 1973), *aff'd,* 494 F.2d 1196 (1st Cir. 1974), *cert. denied,* 419 U.S. 977, 95 S.Ct. 239, 42 L.Ed.2d 189 (1974); *Smith v. Sampson,* 349 F.Supp. 268 (D.N.H.1972); *Jones v. Wittenberg,* 323 F.Supp. 93, 330 F.Supp. 707 (N.D. Ohio 1971), *aff'd,* 456 F.2d 854 (6th Cir. 1972).

## I. LIVING CONDITIONS AT THE INTERIM JAIL

▉ Female pretrial detainees are housed on the fourth floor of the Interim jail at 11th and Dodge Streets, Omaha, Nebraska. The jail was built in 1920, and other than some painting and cleaning and the creation of a dayroom out of a cell, the facility has never been remodeled. It is generally acknowledged that the jail is substandard and that it will be demolished when new quarters become available[2] [*see* Exhibit 8u].

The women occupy four four-person cells measuring eight by ten feet each and one six-person cell measuring eight by twelve feet. Each cell contains either four or six steel bunks, a toilet, a sink and a nightstand. Female pretrial detainees and convicted inmates are sometimes housed together. The population averages twelve to eighteen women, and a total of twenty-two can be accommodated.

The cells are located along a narrow L-shaped corridor at the end of which is a heavy steel door leading into the matron's office. As only one matron is on duty at a

2. A regional corrections facility is being constructed and is expected to be available for use within eighteen to twenty-four months.

time, she is usually outside of the actual detention area, and has to be summoned by a detainee in the event of a fight, illness or fire in the inmate area.

The cell doors are barred as are the windows located along the corridor. There are no skylights or windows in the cells. Some natural light enters the area, but lighting primarily comes from the incandescent bulb in each cell. The overall atmosphere is that of a dark, grimy cage.

Ventilation and circulation of air present serious problems in the Interim jail. Heat is provided by steam radiators in the winter months. The temperature varies considerably and it is unclear whether there is any thermostat or other regulating mechanism. In the summer, the heat is stifling. Two fans circulate air to a minimal extent. There is no other ventilation or air circulation system. Windows can be opened to let in fresh air, but there is no relief from the heat and humidity. The matron's office and the warden's office are air conditioned, but the cell detention area is not. The matron deposed by the plaintiffs characterized the detention area in the summer as very uncomfortable and very hot.

The plumbing in the Interim jail is antiquated. Sinks in the cells provide only cold water. Hot water in the shower is depleted after use by one or two persons. Sinks and toilets clog. There are no facilities for drinking water except the sinks or shower faucet, and in the summer, cool drinking water can be obtained only by storing water in the refrigerator in the dayroom.

The Court observed no fire escapes or sprinkling system. There is an evacuation plan in case of fire or other emergency, but no drills are ever conducted to determine the actual effectiveness of the plan.

Upon admission to the jail, the detainees receive a uniform which is essentially a green cotton shift with two pockets and two buttons. These garments are laundered twice a week. Detainees keep their own shoes and underclothes. They also receive one blanket, mattress cover, sheet, pillow, pillow case, towel, washcloth, bedspread, styrofoam cup, bar of soap, and

foam mattress which measures approximately six feet by eighteen inches by four inches. They must purchase their own toothbrushes and toothpaste if financially able to do so. Sheets are changed once a week. Mattresses are sterilized upon the release or transfer of the detainees using them.

Lack of space and lack of privacy cause extreme discomfort. There is one open shower stall with no door or curtain and with a single shower head. The only mirror in the detention area is a face mirror located in the hall outside of the shower stall. Women with communicable disease, drug or alcohol problems are not separated from the general population. If a detainee is experiencing drug withdrawal, she may be hospitalized. Otherwise, there is no program for dealing with drug or alcohol abuse. Toilets are essentially public and must be used in the presence of up to three cellmates. When the cells are full, each woman is reduced to approximately twenty square feet of living space. Even if only two detainees are housed in a cell, space per detainee is forty square feet. This square footage does not represent actual floor space in which the detainee may move around, as each bunk occupies twelve square feet. For discussion of minimum standards for space to which detainees are entitled, see *Detainees of Brooklyn House of Detention for Men v. Malcolm*, 520 F.2d 392, 396–99 (2nd Cir. 1975); *Ambrose v. Malcolm*, 414 F.Supp. 485, 492–94 (S.D.N.Y. 1976); *Pugh v. Locke*, 406 F.Supp. 318, 332–34 (M.D.Ala.1976); *Rhem v. Malcolm*, 371 F.Supp. 594, 600–601 (S.D.N.Y.1974), aff'd, 507 F.2d 333 (2nd Cir. 1974); *Inmates of Suffolk County Jail v. Eisenstadt*, 360 F.Supp. 676, 679, 687–88 (D.Mass.1973), aff'd, 494 F.2d 1196 (1st Cir. 1974), cert. denied, 419 U.S. 977, 95 S.Ct. 239, 42 L.Ed.2d 189 (1974).

The women eat their meals in the hallway outside of the matron's office sitting in a long row of chairs facing the wall. This "dining room" hallway is also the area where attorneys visit with their clients. A

small office used by jail personnel may be available for attorney-client visits. However, it is clearly conceded that the primary area for attorney-client consultation is the public hallway.

An example of the deficiencies inherent in the physical structure in which the female detainees are kept is provided by the kitchen. The parties agree that a trained dietician supervises the menus and preparation of food. The Court inspected the kitchen and noted the clean and relatively modern stainless steel food lockers and sinks. Utensils seemed clean. The floors and walls were free of any recently accumulated dirt or grease. The Court regards the kitchen as indicative of the good faith efforts of the staff, particularly Mr. Terry, to make the best of the facilities with which they have been provided. But the kitchen walls and ceiling are covered with forty to fifty years of grease and dirt which is essentially unremovable.

The same condition is true of the actual detention area. While detainees are provided with the equipment and opportunities for cleaning their cells, and in fact are required to do so, no amount of surface cleaning can eliminate the layers of filth, rust and peeling paint attributable to the age and disrepair of the physical structure.

The Court finds that itemizing the deficiencies of the Interim jail fails to convey the full extent of the facility's inadequacy. The living conditions are severely punitive in effect, and, in the words expressed in *Miller v. Carson,* 401 F.Supp. 835, 873 (M.D. Fla.1975),

> [i]n summary, the overall environment of the inmate housing areas . . . gave one the psychological feeling of being trapped in a dungeon.

The Court concludes that the Interim jail is totally unfit for use as a correctional facility in which to detain persons who are unconvicted of any crime and are merely awaiting trial. Within sixty (60) days hereof, the defendants shall submit a plan for providing the female pretrial detainees with a constitutional living environment.

## II. RECREATION AND EXERCISE

At the Interim jail where female detainees are incarcerated, there are no facilities for exercise and recreation. The women awaiting trial are held in cells measuring approximately eight by ten feet, with up to four detainees in each cell, except for one cell which houses six women. There is a television set in each cell. There is also a dayroom which contains a table, two benches, a sink, refrigerator, toilet, magazine rack and ironing board [*see* Exhibit 7, page 6]. The dayroom, converted from a cell, cannot accommodate more than four persons at a time. The detainees could conceivably walk along the L-shaped corridor outside the cells [*see* Exhibit 7, page 5]. However, the corridor is so narrow that two people cannot comfortably pass each other when proceeding in opposite directions. The defendants claim that materials for sewing, handicrafts, basketweaving, flower arranging and decoupage are available. The plaintiffs deny that such materials are provided, and when the Court visited the facility, none of the detainees appeared to be engaged in such occupations. The fact is that female inmates await trial for periods of up to sixty days relegated to their cells and to a dayroom which is a cell. There is no program for recreation and no place for exercise. The Court finds that opportunities for basketweaving and handicrafts, even if provided, do not compensate for the extended periods of enforced idleness and the lack of fresh air and physical activity.

No one really disputes the inadequacies of the Interim jail, particularly with regard to the absence of facilities for recreation and exercise. In their depositions [Exhibits 2 and 3], both Rosemary Heafey, a matron, and Charles Terry, the Deputy Director of Corrections with jurisdiction over the Interim jail and two other facilities, expressed their concern about the absence of exercise opportunities for the female pretrial detainees.

During 1973, female inmates were transferred to the Clearview Annex at 156th and Maple Streets, Omaha, Nebraska, in an effort to provide them with outdoor recrea-

tion, training and improved living conditions. At the Clearview Annex, for example, there was a fenced-in recreation area with supplies for team sports such as volleyball and tennis. However, problems caused by dormitory living, security, and transportation for visitors to this more remote facility caused the decision to return the women to the Interim jail.

At the Courthouse jail, there are no outdoor exercise facilities or recreation programs. Up to 102 detainees are housed in six dormitories and a maximum security area with twelve one-man cells. A television set and radios are allowed in each dormitory if furnished by the detainees. In the maximum security cells, radios are permitted. A dayroom measuring twenty by twenty-two feet contains exercise materials including a punching bag, parallel bars, a wrestling mat and a ping pong table. In the maximum security section of the jail, there is a dayroom measuring eight by six feet. Essentially, male pretrial detainees housed at the Courthouse jail await trial in their dormitories and cells.

In contrast, the institutions for convicted male and female inmates in Lincoln, Nebraska, include outdoor exercise fields, programs and facilities for team and individual sports, such as baseball, basketball, boxing, badminton, volleyball, weight lifting and horseshoes. The recreation programs include movies, arts and crafts and organized intramural sports [see Exhibit 5 at pages 17–19, 31].

 Thus, pretrial detainees in Omaha, Nebraska, although presumed innocent because they have not been convicted of crimes, are treated far more harshly than convicted inmates in Lincoln, Nebraska. The law is clear that "the conditions for pre-trial detention must not only be equal to, but superior to, those permitted for prisoners serving sentences for the crimes they have committed against society." *Hamilton v. Love*, 328 F.Supp. 1182, 1191 (E.D.Ark. 1971). "If a pretrial detainee is incarcerated in worse circumstances than the convict who is being 'punished', it is difficult to say that the detainee is not also being pun-

ished." *Inmates of Suffolk County Jail v. Eisenstadt*, 360 F.Supp. 676, 686 (D.Mass. 1973), aff'd, 494 F.2d 1196 (1st Cir. 1974), *cert. denied*, 419 U.S. 977, 95 S.Ct. 239, 42 L.Ed.2d 189 (1974). *Accord, Miller v. Carson*, 392 F.Supp. 515, 520–21, 401 F.Supp. 835, 892–93 (M.D.Fla.1975). As indicated previously, detainees who have not been convicted of crimes may not be punished at all.

In recent years, a number of courts have addressed this aspect of the treatment to which pretrial detainees are entitled. *See, e. g., Alberti v. Sheriff of Harris County, Texas*, 406 F.Supp. 649 (S.D.Tex.1975).

All inmates in county detention facilities shall receive one hour of physical exercise outdoors three times per week, weather permitting. *Id.* at 677.

[T]he Court recognizes the strain on available manpower, lack of appropriate recreational space at the downtown County Jail and potential threat to security *which a group exercise period poses. However, an absolute denial of such exercise violates even the most basic legal standards of jail operation.*

Defendants should ensure that all inmates exercise and that at any one time exercise is provided for a prescribed number of inmates commensurate with available manpower for monitoring the activity. Additionally, defendants should provide exercise and recreational equipment. *Id.* at 690–91. [Emphasis added.]

*See also Miller v. Carson*, 401 F.Supp. 835 (M.D.Fla.1975).

What is most distressing is that at least 90% of inmates in the Duval County Jail never leave their cramped cellblocks, not even to eat meals. In addition, the continuing inadequacy of the ventilation and temperature control exacerbate what is already a cage-like atmosphere. Therefore, what this Court is most concerned about is providing an opportunity for daily exposure to fresh air and sunshine, and not a highly sophisticated athletic program.

Since the implementation of such a program requires time and additional per-

sonnel, the defendants will be given ample opportunity to plan accordingly. *Therefore, the defendants will be required to implement a program of daily outdoor recreation within one year and a three day a week program within 180 days of the date of this permanent injunction. Id.* at 893. [Emphasis added.]

*Accord, Rhem v. Malcolm,* 371 F.Supp. 594 (S.D.N.Y.1974), *aff'd,* 507 F.2d 333 (2nd Cir. 1974), *remanded,* 389 F.Supp. 964 (S.D. N.Y.1975), and *Rhem v. Malcolm,* 396 F.Supp. 1195 (S.D.N.Y.1975), *aff'd,* 527 F.2d 1041 (2nd Cir. 1975).

> The right of a prisoner to reasonable physical exercise is fundamental. Where necessary, courts have required structural alterations to provide the required space, *see, e. g., Hamilton v. Love, supra,* 328 F.Supp. at 1193 and decree of June 22, 1971, Par. 7D; *Wayne County Inmates v. Wayne County Board of Commissioners,* Civ. # 173–217 Circuit Court, Wayne County, Michigan, July 28, 1972, at 25–6, and have ordered that particular periods of exercise be made available, *Hamilton v. Landrieu, supra,* 351 F.Supp. at 550, or that outdoor exercise areas be created, *Taylor v. Sterrett, supra,* 344 F.Supp. at 422. *See also, Holland v. Donelon,* Civ. No. 71–1442 (E.D.La., June 6, 1973) at 12 and cases cited, *Brenneman v. Madigan, supra,* 343 F.Supp. at 135, 140; *Conklin v. Hancock, supra,* 334 F.Supp. at 1122 and *Jones v. Wittenberg, supra,* 330 F.Supp. at 717.

> The 50 minute per week opportunity for exercise at MHD (even supplemented by other recreational programs) does not meet constitutional standards. 371 F.Supp. at 627.

> Defendants shall forthwith . . . take all steps necessary to employ such additional correctional personnel as is necessary to afford every detainee a period of one hour outdoor exercise, Mondays through Fridays inclusive, except in inclement weather. Defendants shall permit detainees to possess warm outer garments and shall provide warm outer garments to indigent detainees to facilitate outdoor recreation in cold weather. 396 F.Supp. at 1202.

*See also Martinez Rodriguez v. Jimenez,* 409 F.Supp. 582 (D.P.R.1976); *Dillard v. Pitchess,* 399 F.Supp. 1225 (C.D.Cal.1975); *Brenneman v. Madigan,* 343 F.Supp. 128 (N.D.Cal.1972); *Hamilton v. Love,* 328 F.Supp. 1182 (E.D.Ark.1971), 358 F.Supp. 338 (E.D.Ark.1973).

■ In light of the above consensus that reasonable opportunities for recreation and exercise are required for pretrial detainees, the Court shall order the defendants to submit plans for the establishment of recreational facilities and programs for the plaintiffs housed in the Courthouse and Interim jails. This case has been pending for four years, and there have been extensive negotiations by the parties during that period. The Court believes, therefore, that this order requiring the formulation of a plan for exercise and recreational facilities should not unduly surprise the defendants. Accordingly, the Court shall require the submission of the above ordered plan in writing within sixty (60) days of the date hereof. The plaintiffs may, within the same period, submit their own written proposals as to the means by which constitutionally sufficient recreation and exercise opportunities may be achieved.

## III. VISITATION

### A. General Visiting Regulation

■ The plaintiffs protest the limitations on their visiting privileges, specifically the frequency of visits, the denial of physical contact visiting, and the restrictions on persons who may visit the detainees. The Court has reviewed Rule 8 of the amended and collated jail rules and finds that the rule is not unconstitutionally restrictive.

### B. Attorney-Client Visits.

■ In the Interim jail, facilities for private attorney-client visits do not exist. Consultation usually takes place in the hallway. The warden's office may be available

occasionally if he chooses to relinquish it for attorney-client meetings. However, there is no physical facility specifically set aside for this purpose in which the pretrial detainees have a right to consult privately with attorneys and witnesses. Such conditions impede the detainees' ability to prepare for trial, jeopardize the confidentiality of their attorney-client communications and invade their right to privacy. Apparently a similar lack of privacy for such consultations prevails in the Courthouse jail. The Court shall therefore order that within sixty (60) days of the date hereof the defendants shall submit a plan by which private facilities for attorney-client visits in both jails may be obtained.

## IV. TELEPHONE USAGE

■ It is clear that the plaintiffs have a constitutional right secured by the First Amendment to communicate with persons from outside the prison by means of mail, visits and telephone calls. In the decisions which have considered the issue, all agree that eavesdropping or monitoring of detainee telephone calls is constitutionally objectionable. *See, e. g., Inmates of Suffolk County Jail v. Eisenstadt*, 360 F.Supp. 676, 690–91 (D.Mass.1973), *aff'd*, 494 F.2d 1196 (1st Cir. 1974), *cert. denied*, 419 U.S. 977, 95 S.Ct. 239, 42 L.Ed.2d 189 (1974); *Inmates of Milwaukee County Jail v. Petersen*, 353 F.Supp. 1157, 1169 (E.D.Wis.1973); *Brenneman v. Madigan*, 343 F.Supp. 128, 141 (N.D. Cal.1972); *Jones v. Wittenberg*, 330 F.Supp. 707, 719 (N.D.Ohio 1971), *aff'd*, 456 F.2d 854 (6th Cir. 1972).

■ In the Courthouse jail, calls are placed through a switchboard, and some of the detainees believe that jail personnel or the telephone operators listen to the conversations. In the Interim jail, calls are placed on a telephone in the matron's office often in the presence of the matron. The Court finds that the suspicions of the detainees in the Courthouse jail concerning eavesdropping are not supported by the record. Nevertheless, prison personnel are specifically enjoined by this Court from ever engaging in such practices.

■ The presence of a custodial officer when detainees place or receive telephone calls in the Interim jail raises "serious constitutional questions." *See Brenneman v. Madigan*, 343 F.Supp. 128, 141 (N.D.Cal. 1972). The Court concludes that this practice poses a threat to the detainees' First and Sixth Amendment rights as well as to their attorney-client privileges. The Court notes that Rule 8 of the Amended and Collated Rules for the Government of the County Jails within the Fourth Judicial District requires the Sheriff to keep a log identifying persons to whom calls are placed, their relationship to the detainees and their telephone numbers. Accordingly, the Court shall order that whenever a detainee in the Interim jail places a call to her attorney of record from the telephone located in the matron's office, the matron and other jail personnel must leave the room so that the conversation may be conducted in privacy. If the defendants prefer to ensure privacy at least as to attorney-client calls by some other means, such as by installing a telephone in another location, the Court shall retain jurisdiction to enter such further orders in this case as may be required.

■ Rule 8 of the Amended and Collated Jail Rules governs the plaintiffs' access to the telephone, and the Court finds that the rule is substantially enforced. Each detainee is allowed to make three outgoing telephone calls in any five-day period. Calls may be placed only from 9:00 to 11:00 A.M., 2:00 to 4:00 P.M. and 6:00 to 9:00 P.M. Calls may not exceed five minutes each, except those to or from the detainee's attorney of record. Any inmate without legal counsel may make as many calls as are reasonably necessary to obtain counsel. The Court declines to alter these provisions for access to the telephones. The Court cannot conclude from the record that the defendants are restricting communication between detainees and the outside world more than is necessary to maintain order, security and discipline. The limitations on

telephone use do not appear unreasonable or abusive.

## V. LEGAL REFERENCE MATERIALS

█ Sheriff Theodore J. Janing has indicated in his affidavit [Exhibit 11, page 2] that "[d]etainees do not have to request law books by name but merely provide the librarian with the nature of the subject. Large law books which are borrowed are not permitted in the dormitories, but are made available for study to residents who wish to use them in the dayroom and in the multi-purpose room." This policy has apparently been implemented only in the Courthouse jail and should be extended to the pretrial detainees who are confined in the Interim jail. The Court declines at this time to require the defendants to purchase an extensive law library for the Courthouse and Interim jails for the benefit of pretrial detainees. However, if lawbooks are donated to the institutions, they should be made readily available to the inmates. During settlement negotiations in the Court's chambers, counsel for the plaintiffs expressed his willingness to provide a list of basic reference materials which would be helpful to any detainees seeking to represent themselves in state criminal trials. If counsel for the plaintiff furnishes such a list, the defendants shall post the list in a conspicuous place in both jails.

## VI. DISSEMINATION OF JAIL RULES

Neb.Rev.Stat. § 47–101 (Reissue 1974) requires the judges of the district court to make rules governing the county jails on matters which relate to living conditions in the jails and to punishment for violation of the prison rules.

█ Inmates have a right to notice of rules which govern prisoner conduct, rights and privileges. "Prior notice of jail rules is indispensable to a subsequent due process enforcement of those rules by the imposition of sanctions or even denial of privileges." *Hamilton v. Love*, 358 F.Supp. 338, 346 (E.D.Ark.1973). *See also, Martinez Rodriguez v. Jimenez*, 409 F.Supp. 582, 594–95 (D.P.R.1976); *Dillard v. Pitchess*, 399 F.Supp. 1225, 1241 (C.D.Cal.1975).

█ The sheriff shall therefore obtain copies of the most recent Amended and Collated Rules for the Government of the County Jails within the Fourth Judicial District of Nebraska [*see* Exhibit 10] and shall post these rules in a public place, such as the areas where detainees eat their meals. In addition, an official within each prison shall be designated by the sheriff to retain copies of the rules. Each incoming detainee shall be specifically informed that the rules may be obtained from such designated person or source in each of the jails where pretrial detainees are housed. Moreover, a short statement that the rules are available shall be posted conspicuously in a public area of each jail.

It is particularly important that each pretrial detainee be informed of the contents of Rule 9, which governs the punishment of prisoners for violation of the prison regulations. This rule establishes procedures to assure minimal due process to inmates in connection with the imposition of sanctions or discipline or the removal of privileges. The Court therefore shall order the sheriff, his agents and employees, to comply fully with the provisions of Rule 9 before any disciplinary action or removal of privileges is taken with respect to a pretrial detainee, as well as to distribute the rules and to display them conspicuously in the manner discussed above.

An order has been filed contemporaneously herewith in accordance with this memorandum opinion.